# IN THE SUPREME COURT OF IOWA

No. 12–1182

Filed July 18, 2014

**DENNIS L. SMITH,**

Appellee,

vs.

**IOWA STATE UNIVERSITY OF SCIENCE AND TECHNOLOGY** and **STATE OF IOWA,**

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Story County, Kurt J. Stoebe, Judge.

Employee and university were granted further review of court of appeals decision affirming in part and reversing in part the district court's denial of the university's posttrial motions following verdicts for the employee on intentional infliction of emotional distress and whistleblower claims against the university. **DECISION OF COURT OF APPEALS AFFIRMED IN PART, VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

William W. Graham and Aimee R. Campbell of Graham, Ervanian & Cacciatore, LLP, Des Moines, for appellee.

Thomas J. Miller, Attorney General, Diane M. Stahle and Jordan G. Esbrook, Assistant Attorneys General, for appellants.

**MANSFIELD, Justice**.

After a trial of more than two weeks, a jury and a judge awarded Dennis Smith, a writer formerly employed by the College of Engineering at Iowa State University (ISU), a total of $1,284,027.40 in damages against ISU and the State of Iowa. Smith recovered $500,000 for intentional infliction of emotional distress and an additional $784,027.40 under a whistleblowing statute for retaliation suffered because he reported managerial misconduct to ISU's president. ISU and the State appealed, and the court of appeals affirmed the intentional infliction of emotional distress award, but set aside the statutory whistleblowing award.

On further review, for the reasons described herein, we too affirm the jury's emotional distress award. We also reduce, but do not set aside, the district court's award of damages under the whistleblowing statute. We agree with the State that Smith's loss of his job in a downsizing that occurred in 2010 cannot be causally linked to any reporting he made to ISU's president approximately three years earlier, and therefore we vacate $634,027.04 of his whistleblower damages. In all other respects, we uphold the district court's rulings.

### I. Facts and Procedural History.[1]

Dennis Smith was born and raised in Omaha, Nebraska. After holding a variety of jobs, getting married, and graduating from college, Smith entered a doctoral program in English at the University of Iowa in the late 1980s. While there, Smith established and directed a gun control organization. Smith did not obtain his doctorate, but his spouse

---

[1]We recite the facts in the light most favorable to the plaintiff, who prevailed at trial.

received a graduate degree from the university. In 1999, both of them moved to Des Moines so she could pursue her career. In July 2000, Smith's spouse suffered a devastating stroke that left her homebound.

In April 2001, Smith was hired at ISU to be a Communication Specialist III for the Engineering Communications and Marketing (ECM) Department of the College of Engineering at ISU. Smith wrote and edited articles for alumni magazines and other print publications. ECM's clients included not only the College of Engineering, but also other ISU colleges and even some outside entities not affiliated with ISU.[2] ECM's staff included writers like Smith, as well as web design and graphic design specialists. As it later turned out, one advantage of this position for Smith was that he could communicate by cell phone or video computer link throughout the day with his disabled wife.

Smith's boss was Pamela Reinig, the director of the ECM department. Over the years, Smith received positive job performance evaluations from her. Reinig's reviews of Smith's writing were especially laudatory. By 2002, Smith was taking on supervisory responsibilities, and Reinig told him she would have his job classification upgraded to Communications Specialist IV. As part of Smith's July 2002 evaluation, Reinig wrote, "I will submit a reclassification request for your position in August 2002. Since January you have been doing the work of a Communications Specialist IV, so it is fitting to try to get you reclassified

---

[2]ECM operated on a cost-recovery basis and billed out its time, both to other ISU departments and to outside clients. The money generated helped support the operations of ECM but did not cover actual costs.

to that level." Smith received and retained a copy of this 2002 written evaluation of his performance.[3]

For the next three years, Smith did not get the promotion. Reinig gave Smith various excuses as to why he had not received it, while continuing to tell Smith she was submitting him annually for reclassification. It later came to light that, despite her promises, Reinig had not submitted Smith's name for reclassification.

Smith finally obtained the upgraded classification in July 2005. This occurred shortly after he notified Reinig that he was looking for work elsewhere. Smith told Reinig at the time he was "basically fed up with supervising people at [his] own pay grade." In response, Reinig begged Smith not to leave and assured him that he would not have to supervise anyone and that she would submit him again for reclassification. Thus, Smith received the promotion, but no longer had to supervise anyone. Smith later wrote that he was "relieved to be free of responsibility for supervising employees who were not qualified for their positions and in whose hiring [he] had little apparent influence."

Smith acknowledged that he has an "assertive personality." As he put it, "I'm not passive certainly. I mean I tell the people what I feel, and I try to do it as respectfully as possible." Smith denied that he was ever inappropriately aggressive. He testified that Reinig was aware he had previously headed a gun control organization. Numerous coworkers testified that Smith never acted in an angry or threatening manner.

In 2006, Reinig began the hiring process for a Communications Specialist IV in ECM who would have supervisory responsibilities. Reinig

---

[3]The Microsoft Word version saved on Reinig's desktop computer was missing the paragraph where Reinig promised to try to get Smith a promotion. Smith contends that Reinig deleted the paragraph from her version of the evaluation as an act of fraud.

told Smith she wanted him to make the final decision on whom to hire because she felt she had a conflict of interest with respect to one of the candidates, Eric Dieterle. Dieterle had previously worked for Reinig in the ECM department, leaving in 2000 before Smith arrived.[4] After examining the thirteen candidates, Smith rated Dieterle at the top and as "the best person for the job," but also told Reinig that "the pool was weak." In his detailed assessment of Dieterle for Reinig, Smith wrote:

> [Dieterle] is clearly a talented writer and a competent (if not particularly robust) editor, and I would not hesitate to recommend him at the level of Communications Specialist III. However, to support his candidacy for Communications Specialist IV in the College of Engineering (as opposed, say, to LAS or Business) requires evidence of accomplishment and/or experience that he did not present in either the application or interview process.

> *On a personal level,* I would be surprised should Eric, if hired, not fulfill the demands of the position and fulfill them well. But that is an assessment based on instinct, and instinct in the absence of objective evidence is not sufficient for me to make a positive recommendation in this case. . . .

> *The bottom line*: Given the lack of evidence of relevant experience in general feature-length writing and editing, much less in the areas of science or technology, I cannot specifically recommend Eric for the position. However, given his obvious talent and intelligence as a writer, coupled with some evidence of higher-level editorial instincts and capabilities, I would have no objection to his joining ECM. We are desperately in need of higher-level writing skills if we are to achieve the marketing goals of the college, as I understand them. However, unless we reopen a considerably expanded search process and/or raise salary levels to compete for science and technology writers at the highest levels, Eric may represent the best choice for the college at this time.

Reinig conceded in an email to Smith, "What I really need is to hire another you—but that's probably a once-in-a-lifetime deal."

---

[4]Dieterle had relocated to Reno, Nevada, but for family reasons was interested in moving back to Ames. By the time of trial, Dieterle was no longer working at ISU and had moved to Arizona.

Reinig ended up hiring Dieterle later in 2006. Although another qualified candidate had entered the pool by then, Reinig offered the job to Dieterle before giving the other candidate an opportunity to finish her review and application procedures. An internal investigation of the hiring process later revealed "serious violations of policy" and "manipulation of the process and inaccurate accounts of the process by Ms. Reinig."

When Reinig began the job search for the position eventually filled by Dieterle, she announced that the person hired would not supervise Smith. However, in January 2007, Smith's wife fell at home and sustained a shoulder injury. Smith took family medical leave to attend to her, although he continued to do some work from home. The following month, Reinig emailed Smith to notify him that Dieterle would supervise Smith's newsletter work.

On March 19, when Smith returned to ISU from his leave, he went to Reinig's office. Smith told Reinig he wanted to discuss her directive that Dieterle would be supervising Smith's newsletter work. Reinig cut Smith off and said, "[T]here's nothing to talk about really, it's my decision so that's what we're going to do." Smith admits he "got [his] back up," expressed his frustrations, and criticized the Dieterle hire. Reinig responded defensively and told Smith that if he did not like it, he could take his concerns to the dean. Smith felt he had never been treated that peremptorily before by Reinig. As a result of their argument, Reinig issued Smith a "verbal warning" on March 21. Smith denied that he was abusive or threatening during the meeting; he simply challenged Reinig on her broken promises.

Meanwhile, just before Smith went on leave in January 2007, it had come to his attention that ECM was not receiving payment for

certain work it was performing for an outside entity—the Council of Advancement for Support of Education (CASE). Smith did not raise this subject with Reinig in their March 19 meeting.

Following his March 19 episode with Reinig, Smith did some research on his job-related rights and learned he might be eligible for a retroactive pay increase if he had qualified for reclassification before 2005. He went to the ISU compensation and classification office, where he learned Reinig had never submitted his name for reclassification before 2005. At this point, Smith decided to act on Reinig's invitation to "take it to the dean."

Smith began writing up a grievance but also consulted with an ISU faculty member whom he trusted. The faculty member recommended to Smith that he bring his concerns about the CASE billing to the Dean of the College of Engineering, Dr. Mark Kushner.

On March 22, Smith emailed Dr. Kushner to request a meeting. Smith asked that his request to meet be kept confidential. The two got together later that day. During the meeting, Smith informed Dr. Kushner of his intention to file a formal grievance against Reinig for several issues relating to his employment. He also disclosed that he believed ECM was not properly billing CASE for work performed by ECM and that he suspected misconduct on Reinig's part.

Dr. Kushner asked Smith to provide additional details about the billing issue. In the conversation, Dr. Kushner agreed to maintain the confidentiality of what Smith told him.

A week later, Smith emailed Dr. Kushner a document that showed the hours of work ECM had completed for CASE over a six-year period, the actual billings submitted to CASE, and the discrepancy between hours billed and hours worked. In the main text of the email, Smith

added, "As per your statement, I consider my reporting obligations fulfilled under university regulations, and leave the resolution of this issue to your office."

The next morning, Dr. Kushner communicated via email with the business manager of the College of Engineering, Ellen Reints. Dr. Kushner's email enclosed Smith's email and attachments. Dr. Kushner asked Reints, "In your opinion, has there been misconduct? What is the next step I need to take?" Reints responded, "I don't think I understand the situation and the numbers enough to give an opinion on whether or not there was misconduct." Reints added that "you can't always charge a customer for all of the hours worked," but "there should be a standard practice on how this is tracked." She concluded that she and Dr. Kushner should visit with Reinig to discuss the concern and then consider whether the controller should review the billing processes or an internal audit should be conducted. Responding to Reints's email, Dr. Kushner agreed that they should "meet with Pam [Reinig] to give her a heads up."

Dr. Kushner met with Reinig on April 2. The next day, Smith learned from a fellow employee that Reinig was "broadcasting to people that [Smith] had been complaining to the dean." As a result, Smith "was getting a number of stares and unfriendly responses from several ECM employees" that "felt like retaliation."

On April 9, Reinig informed Dr. Kushner in writing that she had previously initiated disciplinary action against Smith on March 21 and advised him of the verbal warning she had given Smith. She indicated Smith's behavior had been "insubordinate, abusive, and threatening." She noted he had a history of conflict with her and other staff members, but she had tolerated it because she "believed it would improve" and

Smith was "under extreme ongoing stress." She also stated, "In hindsight, I could have been timelier in bringing this action to your attention."

In another memo to Dr. Kushner dated the same day, Reinig disclosed plans to immediately reorganize the ECM writing staff, specifically to reduce or eliminate Smith's responsibilities in certain areas while giving him all of the article-writing duties for the college's alumni magazine. This did not materially add to or subtract from Smith's overall workload, but in his view, it "effectively severed [his] working relationships with every other member of the ECM staff." Some of Smith's coworkers testified at trial that they believed this shift in Smith's work duties was retaliatory.

Smith informed Reinig on April 11 that he would soon be submitting a formal grievance to her, although he did not discuss the substance. Reinig said she was expecting a grievance and pledged they would work through the problem together.

Yet the next day, April 12, Reinig emailed Dr. Gene Deisinger, the commander of the Special Operations Unit of the ISU police.[5] The email was entitled "Safety concern" and read in its entirety as follows:

> I've been referred to you by Heidi Eichorn, who handles HR issues for the College of Engineering. I recently gave a verbal reprimand to a member of my staff following a confrontation in my office that I would describe as insubordinate, abusive and threatening. This employee has a personal situation that keeps him under high-level, unrelenting stress. I am concerned about his potential to become violent.
>
> Heidi thought you might have a process for receiving a "heads-up" on situations like this one. Please let me know what I need to do.

---

[5]Dr. Deisinger has a Ph.D. in psychology.

On April 13, Smith began the formal grievance process by submitting a thirteen-page, single-spaced statement of complaint to his supervisor, Reinig. The complaint covered three issues: (1) Reinig's manner of hiring Dieterle, (2) Reinig's inability to maintain proper working relationships among her subordinates, and (3) Reinig's misrepresentations to Smith regarding his reclassification. Among other things, Smith requested his reclassification be backdated to March 2002 and that he receive backpay with interest and benefits.

Reinig denied Smith's grievance on April 25, but before doing so, she again emailed Dr. Deisinger. This email stated as follows:

> I wanted to let you know that I will hand-deliver to D. Smith tomorrow a response to his grievance. He will not be happy with it. I will be out on travel for several days so his initial reaction will not impact me.
>
> I remain quite concerned about this employee. I followed the trag[edy] at V-Tech closely. So many things said about that individual could also be said about Dennis.
>
> Unless I hear otherwise from you, I will keep you apprised of any developments in this situation.

Dr. Deisinger replied and asked if there had been additional concerns raised about Smith's behavior and instructed her to ensure that staff knew how to call the ISU police in an emergency. Reinig responded to Dr. Deisinger that there were "no additional concerns," but stated, "He remains withdrawn and generally unresponsive during staff meetings. He spends much of his day in his office working with the door closed."

After Reinig denied Smith's grievance, Smith escalated the grievance to the next level to Dr. Kushner. Following a meeting with both Reinig and Smith, Dr. Kushner denied the grievance on May 3 without providing written reasoning for his decision.

On May 8, Reinig contacted both Dr. Kushner and Eichorn in human resources. She requested from Eichorn that Smith be required to

work at home until the grievance process was finished and mediation was completed. She explained:

> The day before our meeting with Dennis, he told another staff member that something big was coming down and the staff member needed to keep his eyes/ears open. Clearly, he had an expectation for the meeting that did not materialize. He was, I believe, both hostile and angry in the meeting, and this explains why. His behavior since then has been very sullen. Whatever level of anger he had going into the meeting was exacerbated by the meeting itself.

Reinig added that Smith's hostility and anger had made her "very uncomfortable." She claimed he had been verbally abusive and had "little regard for some members of the staff." She concluded, "There's no clear indication that his anger would eventually translate into something physically abusive but there's no guarantee that it won't, either." However, Reinig's request that Smith be required to work from home was not granted.

Two days later, on May 10, Reinig again emailed Dr. Deisinger:

> I do have [a new] concern to share with you. Dennis [Smith] and I met with our dean last Thursday (5-3) as part of the grievance process. I believe I shared my impressions of the meeting with you. Earlier this week, I learned from another member of my staff that the day before this meeting, Dennis made a statement to this effect: Something big is going to happen. You'd better be ready. Keep your eyes and ears open.

> I suppose the comment can be interpreted many ways. I assume he thought that I'd be seriously reprimanded at the . . . meeting. I wasn't so his anger was likely exacerbated.

> I've shared the comment with my dean and our college HR person. I'm not sure anything can be done. However, I want to be on record with you that my unease is growing. Dennis and I have offices in the same suite. I no longer feel comfortable being in the suite when others are absent.

The same day, Dr. Deisinger prepared a "Critical Incident Response Team Threat Assessment Protocol" that named Smith as the "subject" and Reinig as the "target." In a list of possible threats forming the basis

for the assessment, "physical violence" was circled with a question mark next to it and "harassment/intimidation" was also circled. The form indicated that Smith's stressors included his wife's stroke and the loss of support from his coworkers.

Smith once again escalated the grievance by submitting it to the ISU's grievance committee on May 23. Upon learning of Smith's decision to bring the grievance to the next level, Reinig contacted Eichorn and Dr. Deisinger. Her email stated, "Knowing [Smith] as I do, the fact that he feels compelled to take another step will only exacerbate his anger. If he is denied at the Provost level, which I expect, he will become angrier still." She went on to indicate she was "getting increasingly uncomfortable as this moves on," because she knew he was "getting angrier."

In response, Dr. Deisinger asked Reinig, "Can you describe how you see Dennis getting angrier? What behaviors or comments contribute to your assessment?" Dr. Deisinger went on:

> I understand your view of the likelihood of Dennis' increased frustration/anger if a finding is not made in his favor. However, that he continues to utilize appropriate processes for his grievance is a good sign. If there is any variation from that, please let me know." Dr. Deisinger also sent an email to a broader group (including Reinig) seeking "any observations of [Smith's] recent behavior, communications and demeanor.

His email requested that replies be routed only to him. Reinig responded with a list of concerns similar to those she had already voiced: Smith was withdrawn, stayed mostly in his office, and was not communicating with her in a collegial manner.

On June 1, Reinig again contacted Dr. Deisinger with additional concerns about Smith. This time, she indicated Dieterle had "observed significant changes in [Smith's] behavior over the past two weeks,

roughly coinciding with Dean Kushner's decision to deny the grievance." She said her "greatest concern" regarding Smith was that "[u]nless he is somehow vindicated, [Smith] will become angrier as this process continues." Reinig added, "[Smith] will reach a breaking point and I have grave concerns about the way it will manifest itself." She stated that Dr. Kushner and supervisors on her staff were "concerned about [Smith's] potential to become violent."

On June 4, Reinig provided Dr. Deisinger with a copy of a memo authored by Dieterle to her. In it, Dieterle outlined concerns about Smith's "detrimental influence" within ECM. Dieterle said, "Dennis has not been consistently hostile or consistently cooperative . . . , but the instances of negative behavior are such that his continued presence is generally not conducive to building an environment of professional collegiality." Dieterle concluded by stating:

> Quite frankly, my sense of unease increases greatly with this memo: I offer these written comments with no small degree of hesitation, fearing the risk of becoming a direct target of retribution. I can only hope that those in the university's administration will sincerely appreciate the concern this causes for me and for my family.

Dieterle later testified he prepared the document only because Reinig had asked him to do so.

After receiving the memo on June 6, Dr. Deisinger asked a detective to interview Dieterle. Dieterle told the detective he did not feel physically threatened by Smith, nor did he feel Smith was going to physically strike out. His concern rather was with Smith's "constant negativity." Dr. Deisinger passed along the interview report to Dr. Kushner, Eichorn, Reinig, and several others. In an accompanying email, Dr. Deisinger summarized, "[I]t does not appear that there are concerns about any specified or imminent violence. Therefore, the

situation continues to be primarily a personnel issue, best handled through appropriate personnel policies and actions."

Reinig responded privately to Dr. Deisinger, "I agree that performance is an issue but I remain concerned that Dennis is reaching a breaking point. The wild fluctuations in his mood clearly indicate problems." She requested either separate interviews for herself and Smith before the grievance committee, or the presence of a DPS officer, commenting, "I grow increasingly fearful for my personal safety."[6]

The grievance hearing took place on June 14. Despite Reinig's request for separate interviews, it was decided by the hearing committee chair and Dr. Deisinger that there was no reason both parties should not appear at the same time so the committee "has the opportunity to obtain as much information as it can."

Following the hearing, the committee issued a recommendation on June 21. It concluded that Smith's complaint about Dieterle's hiring was outside the time limit for this kind of grievance, but recommended a review of the hiring process by human resources because "several issues came to light with regard to the hiring of Mr. Dieterle." The committee also criticized Reinig's lack of follow through in managing relationships among her subordinates.

Regarding the failure to submit Smith's name for reclassification, the committee initially found as follows:

> The question of whether Ms. Reinig misrepresented the potential of the 2002 reclassification of Mr. Smith appears to be another example of the lack of communication between Ms. Reinig and Mr. Smith. Mr. Smith appears to have been operating under a different understanding, one that was

---

[6]Deisinger later testified that no adverse action was ever taken against Smith by the ISU Department of Public Safety.

never clarified by Ms. Reinig.  Given the lack of compelling proof that Ms. Reinig "promised" Mr. Smith a reclassification in 2002 and the fact that Mr. Smith could have requested the reclassification himself, the hearing committee does not find a violation or make a remedy for this issue.

> . . . .

> . . . If the misrepresentation of a reclassification in 2002 was an unfortunate misunderstanding, [Reinig] has made no effort to discuss the misunderstanding with Mr. Smith, nor has she sought to restore their professional relationship.  This alone is evidence of very poor supervisory judgment.  However, if the misrepresentation was intentional, Ms. Reinig's actions are completely unethical, and she should be subject to disciplinary action.  Based on the evidence, we cannot conclude either way.

However, the committee made additional findings on July 23 after receiving a copy of Smith's 2002 performance review from Smith, a document it did not have at the time of the hearing.  As noted earlier, in the closing paragraph of this job evaluation, Reinig had indicated she would submit a reclassification request for Smith in August 2002.  After receiving this document, the committee reasoned:

> The letter is signed by Mr. Smith and Ms. Reinig and Ms. Reinig acknowledged the signature appeared to be hers on the document.  The 2002 evaluation that Ms. Reinig produced and maintained on her computer was a Word document, unsigned, and did not include the highlighted language above but otherwise included identical content.  Ms. Reinig was unable to explain the reason for these different versions of Mr. Smith's 2002 performance review.  A review of [the] electronic date stamp on the version on Ms. Reinig's computer confirmed that this particular version had not been modified since June 28, 2002.  Unfortunately, neither party could produce the original document in their files or in the personnel file.

> The letter presents a strong likelihood that Ms. Reinig misrepresented the promise to reclassify Mr. Smith.  Absent a plausible explanation by Ms. Reinig, the committee is left with another example of Ms. Reinig's very poor supervisory judgment and very poor record-keeping.  We believe she should be subject to disciplinary action.

Following receipt of the committee's revised recommendation, ISU's Executive Vice President and Provost, Elizabeth Hoffman, accepted it.

She ordered disciplinary action against Reinig and directed Dr. Kushner to report back to her "when and how that disciplinary action has been carried out."

On August 7, ISU's equal opportunity and diversity office conducted a review of Dieterle's hiring. The reviewer concluded "that the search was not conducted according to the policies and procedures set forth to promote consistent and fair treatment to all candidates." She further noted that Reinig had "recently changed the funding for Dennis Smith's salary from continuous funds to grant funds."[7] Smith was the only one of Reinig's subordinates who had been moved to grant funds or "soft funds." The reviewer could see no reason for moving the funding for Smith's position to soft funds and discounted Reinig's explanation for doing so. She recommended that Reinig reverse this decision.

On August 16, Smith submitted a formal written appeal of the provost's acceptance of the committee's recommendation to ISU President Gregory Geoffroy.[8] This was Smith's first communication with ISU's president. In his seven-page, single-spaced appeal letter, Smith complained about not receiving backpay despite the finding that Reinig had acted wrongfully in not getting him reclassified. Smith also identified several acts of retaliation on the part of Reinig, including the removal of other staff assistance from the alumni magazine, the withdrawal of the newsletters from Smith's portfolio, and a pay raise well below the average raise given to others in ECM. Smith's letter did *not* mention ECM's failure to charge CASE for work performed.

---

[7]A position supported by grant funds was in jeopardy of being eliminated, should the funds no longer be available.

[8]Smith never met with President Geoffroy.

On August 28, Smith met with President Geoffroy's executive assistant. Along with his grievance issues, Smith brought up his complaints about Reinig's alleged financial improprieties.

President Geoffroy sent Smith a letter regarding his appeal on September 7. His letter directed that Smith be compensated for the loss of salary resulting from Reinig's failure to seek a reclassification in 2002. In the same letter, President Geoffroy noted:

> Your appeal has raised other important issues that do not fall within the scope of a grievance, such as hiring practices and use of funds. I have decided to order an internal audit of ECM to review compliance with law and policy in ECM.

Smith wrote back to President Geoffroy on approximately September 12. While his letter criticized President Geoffroy's resolution of his appeal as inadequate, it did not mention the allegations of financial improprieties.[9]

Provost Hoffman calculated the amount of retroactive salary and benefits with interest due to Smith at $30,033.66. This money was then paid to Smith. Provost Hoffman further expressed concerns about Smith's raise for fiscal year 2007–2008. The original recommendation had been for Smith to receive a 1.43% raise, but he had actually received a two percent raise. Provost Hoffman noted that Reinig had received a 3.41% pay increase, and the average increase for the rest of the staff was 4.32%. Provost Hoffman indicated Dr. Kushner should "be prepared to offer written justification for the salary increase determination for Mr. Smith."

---

[9]Smith sent additional letters to President Geoffroy on December 10 and December 14 regarding his grievances, neither of which mentioned the alleged financial improprieties.

Smith filed a further appeal to the board of regents on October 10, challenging the adequacy of the remedies provided by President Geoffroy's ruling. In the meantime, Smith also had initiated another grievance.[10] In his appeal to the regents, Smith noted the president's ruling did not address his requests for separation from supervision by Reinig, reversal of the acts of retaliation taken by Reinig during the grievance process, and the restoration of his working relationships. Smith also alleged Reinig had participated in fraud and forgery by altering documents submitted during the grievance process, and he further objected to the method of determining his 2007–2008 pay increase. On November 21, Reinig emailed to Dieterle, "I will reiterate to [Dr. Kushner] that [Smith's] not just a cancer, he's a very real threat to personal safety."

Around Thanksgiving, Dieterle and Dr. Kushner had a meeting in which concerns related to Smith were discussed. Following that meeting, Dieterle wrote a memo to Dr. Kushner that he asked to be kept confidential. In the memo, Dieterle spoke of

> [n]umerous expressions (to me personally) by two other ECM employees of their fear of physical retaliation by Dennis. Specifically, I recently consoled a tearful employee who feared that the Omaha mall shootings were an example of what could happen in ECM, referring directly to a fear of Dennis.
>
> Why I am concerned
>
> Dennis has never explicitly or implicitly threatened me or anyone else in my presence. He does, in my opinion, consistently appear to be sullen, if not angry, and does not, through his demeanor or actions, invite collegiality or collaboration.

---

[10]Smith ultimately filed five grievances, which he characterized as "like Russian nesting dolls."

I have a limited degree of training (intermediate levels of two martial arts and qualification for a concealed weapons permit in another state) that emphasized self-defense awareness. Based on that training, and on what I observe here daily, I would like to be clear that I make myself consistently aware of Dennis' physical location in this office and of his demeanor, and I have mentally rehearsed my alternatives if he were to become openly threatening. How many times have these words appeared in a news story? "He was a loner who felt unappreciated, and was angry at his supervisor and coworkers." I do not intend to become the next unwitting victim.

Dieterle acknowledged that, when he wrote this memo, Reinig was contemplating becoming the advancement director full-time. This would leave open the directorship of ECM. Dieterle also admitted that he and Smith would be two logical internal candidates for the ECM director position. Dieterle further admitted that when he wrote the memo, Reinig was telling him that she was considering Dieterle's wife for a stay-at-home, free-lance, part-time position.

On December 4, Reinig again communicated with Dr. Deisinger. This time she wrote:

The situation with Dennis Smith continues and he has become noticeably more agitated. He spends much of his time with his door closed engaged in loud discussions with another colleague and, I believe, his attorney. Snatches of these conversations are often overheard by Eric Dieterle, whose own office is separated from Dennis' office by a wall. Eric believes (and will tell you so) that Dennis is obsessed to the point of near complete irrationality. Of course, this heightens my personal safety concerns.

I have been advised to develop a personal safety plan, e.g., keeping pepper spray in my desk or purse, in case Dennis confronts me in a threatening manner. I've also been advised to contact your office for the quickest and most efficient procedure to follow in the event of an emergency.

Dr. Deisinger's handwritten note indicates that he left Reinig a phone message warning against keeping pepper spray as a "possible violation of [ISU] policy."

In January 2008, Dr. Kushner put Reinig on administrative leave. The internal audit revealed that improper payments had been made by CASE to Reinig personally and that Reinig had lied about the CASE billings. On January 16, President Geoffroy wrote Smith, informing him that Reinig was no longer directing ECM and that Smith would not report to her in the future. Reinig ultimately resigned in March 2008 under threat of immediate termination. Dieterle was named interim director of ECM, with Smith reporting to him. In July 2008, Dieterle became permanent director of ECM.[11]

Smith testified that after Reinig was put on administrative leave, "My work conditions gradually improved. The atmosphere in ECM was much, much better." Some but not all of Smith's former newsletter duties were restored. Yet he still felt the workplace was "dysfunctional." On April 25, Smith filed another grievance that alleged misconduct by Dr. Kushner and Provost Hoffman. That grievance eventually escalated to another committee hearing. The committee found no retaliation by the dean or the provost in relation to Smith's reporting of alleged financial

---

[11]An audit later conducted by the state auditor revealed that ECM had not received $92,495.06 in outside payments it was due. At the same time, the state auditor found that $58,505.08 had been improperly routed to Reinig personally and deposited in her personal bank account.

The State argues that this audit shows a *different* type of irregularity than Smith had reported. Smith's complaint was that ECM had performed work that was not being billed. The state auditor found that Smith's allegation described a common practice: "Various Departments within the University routinely provide administrative services to professional organizations at little to no charge in order to further the cause of the profession." From the state auditor's perspective, what was objectionable was that billings had actually been generated but not sent. Even worse, Reinig had diverted payments that should have gone to ECM to herself to the tune of $58,505.08.

However, Iowa Code section 70A.28 (2007) merely requires that "the employee reasonably believes the information evidences a violation of law or rule, mismanagement, [or] a gross abuse of funds." The State does not contest that Smith had such a reasonable belief. Nor does the State dispute that Smith's reporting ultimately resulted in the ISU's uncovering Reinig's improper receipt of outside funds.

misconduct or his filing of grievances. The committee also recommended a draft of a negative 2007 performance evaluation of Smith prepared by Reinig be removed from his file and his 2008 raise be elevated to 4.32% to match the ECM unit average. The findings of the committee were adopted by President Geoffroy on August 21, and the recommended actions took place. Smith's source of compensation was also changed back from soft funds to hard funds.

Smith filed a further grievance on September 5. In it, he alleged that Dieterle and others had falsely made accusations that Smith had made threats of physical violence against his coworkers. He requested that the ISU Department of Public Safety be ordered to look into the allegations and that those who made false claims be disciplined appropriately. Though he escalated the grievance, Smith was denied a hearing because President Geoffroy determined it was "not an appropriate matter for the grievance process," as Smith was merely seeking the discipline of other employees and asking for information that had been provided by other employees with an expectation of confidentiality.

On April 16, 2009, Smith filed a claim with the state appeal board and, on April 17, he filed suit against ISU, the board of regents, Reinig, Dieterle, and Dr. Kushner. The petition alleged the three named employees had committed defamation; wrongful interference with employment, business, and professional relationships; intentional infliction of emotional distress; violations of Iowa Code § 70A.28(2) (2007) (whistleblower protection statute); and conspiracy to engage in the wrongful acts. It further alleged a breach of contract by ISU and the board of regents.

In August 2008, Dr. Kushner left ISU. An interim dean took over for a period of time. In July 2009, Dr. Jonathan Wickert became the new dean of the College of Engineering. At the time of his appointment, Dr. Wickert was advised of Smith's grievance history and Smith's pending lawsuit against ISU and the other defendants. Shortly thereafter, in October 2009, the College of Engineering was forced to cut $2 million from its budget (a ten percent cut) because of midyear deappropriations by the State. Dr. Wickert testified that he did not want the budget cuts to affect the academic programs, and therefore he decided the administrative units of the college would absorb the required budget cuts. All administrative units were affected, and a total of twenty-two positions were eliminated from the College of Engineering.

Dr. Wickert decided the ECM unit would be reduced from eleven employees to four employees, would no longer perform outside work, and would be retitled Engineering Communications Relations (ECR). Dr. Wickert's research indicated that ECM was quite large relative to the communications departments at other comparable engineering colleges such as Penn State, Ohio State, Texas, Illinois, and Purdue, which typically had two, three, or four employees. He determined that the communications unit should focus in the future exclusively on promoting the mission of the College of Engineering. Dr. Wickert's vision for ECR entailed an emphasis on new types of media, branding and public relations, and materials that would be a light and fast read.

Dieterle was kept on as the head of the new department, the other ten positions were eliminated, and three new positions with new job descriptions were created: web designer, digital media specialist, and communications specialist. The existing employees, including Smith, received a notice on May 10, 2010, that their positions would be

eliminated effective in August as part of a budget plan including reorganization. All were allowed to apply for the new positions. Smith filed an additional grievance in response to the notification he received on May 10 that his job was being eliminated.

Dieterle worked with the human relations department in drafting the job descriptions for the three positions in the new unit. The communications specialist job description indicated that a majority of the work would involve developing digital communications and web content. A master's degree and experience with graphic design software were listed as "preferred" qualifications.

Dieterle, however, was not involved in the hiring decisions. Dr. Wickert did not want him interviewing and considering people with whom he had previously worked. Therefore, Dr. Wickert appointed a search committee. Originally, there were fifteen candidates for the communications specialist hire. Smith and Jessica Strawn, a coworker in ECM, were the two finalists. The committee's report to Dr. Wickert praised both candidates, indicated that the committee had received very positive references on both candidates, and noted some limitations of each candidate. The committee observed that Strawn, unlike Smith, had an advanced degree (an M.A. from ISU), more aptitude and experience with web-page building and related software, and more ideas and original thinking in her interview for advancing the College of Engineering's mission. Dr. Wickert ultimately decided to hire Strawn and testified he did so because of the points cited in the search committee's report.

Several former coworkers of Smith testified at trial that the reorganization of ECM seemed retaliatory because that department suffered the largest personnel reductions even though it had operated on a cost-recovery basis. Smith testified that he did not believe the

reorganization was conducted as part of a good-faith effort by the college. Smith also maintained that, although he had the minimum qualifications for the new position, he felt the preferred qualifications were written so as to disadvantage his candidacy. Another former coworker felt that the reference to graphic design in the job description was intended to disadvantage Smith, although the search committee actually listed graphic design as a "weakness" for Strawn, the successful candidate.

Smith also believed he was more qualified than Strawn even under the job description as written, at least "to the extent I was aware of [Strawn's] qualifications." As he put it:

> I certainly have infinitely—not infinitely, but considerably more experience, not only in writing and editing, but—in both large and smaller formats, but I'd been doing video production for several years. I'd been working in content management systems. And I didn't know what her design qualifications were. Mine are rudimentary, but as far as I knew, so were hers.

Several months before the reorganization occurred at ECM, there had been a January meeting attended by Dr. Wickert, Dieterle, Eichorn, and three others concerning ECM. At the meeting, according to handwritten notes produced at trial (Exhibit 130), there may have been discussion of "who stays." Six names were listed thereunder, including Dieterle, a person who was identified as a web designer, a person who was identified as a digital media specialist, two persons identified as graphic designers, and a "communications specialist—Adobe products, content management—Jessi Strawn." On the next page, Smith and two other employees were listed as individuals who "would consider" an early retirement incentive program. When later questioned, Dr. Wickert did not recall the meeting.

At the time of trial, Smith was still unemployed despite numerous job applications. Because of what happened to him at ISU, Smith had to see a psychologist starting in August 2007. Smith was diagnosed as suffering from extreme stress and anxiety that significantly impaired his ability to live his life happily. Smith became physically ill and light-headed. He was not sleeping and lost weight.

Smith withdrew his claim from the state appeal board, as there had been no action on it within six months, and filed a second lawsuit against ISU, the board of regents, Reinig, Dieterle, and Dr. Kushner on September 10. The second lawsuit reiterated the emotional distress and statutory whistleblower claims and recited the state appeal board's failure to act. The court later consolidated the two actions.

The attorney general certified that Dieterle and Dr. Kushner were acting within the scope of their employment with ISU and asked that the State be substituted for them as a defendant. *See* Iowa Code § 669.5(2)(*a*). ISU and the board of regents also filed a motion to dismiss the breach of contract claim, which was granted on the basis that Smith had failed to exhaust his administrative remedies related to that claim. Smith agreed to dismiss the individual claims against Dieterle and Dr. Kushner and to have the State substituted for them. This resulted in the elimination of the defamation claim and the intentional interference with contract rights claim with respect to the actions of those two individual defendants. *See id.* § 669.14(4).

Prior to trial, the district court determined the whistleblower claim under Iowa Code section 70A.28(2) was equitable in nature. However, at the close of evidence, the parties stipulated that the jury would decide liability on the section 70A.28(2) claim, with the court determining only

damages.[12]  Additionally, at the close of evidence, the parties stipulated that Reinig—in addition to Dieterle and Dr. Kushner—was acting within the scope of employment, resulting in the elimination of the defamation and interference claims against her as well and the State's assumption of her remaining liability.  Thus, by the time the case went to the jury, the State was effectively the only defendant.[13]

The jury found for Smith on both the intentional infliction of emotional distress and the statutory whistleblower claims.  It awarded Smith $500,000 in damages on the emotional distress claim.  The court then awarded additional damages of $784,027 on the section 70A.28(2) claim.[14]  The court overruled the State's motions for directed verdict, on which it had reserved a ruling, as well as the State's posttrial motions.

---

[12]In its posttrial findings of fact and conclusions of law, the district court specifically referred to this stipulation.  The State now denies there was such a stipulation, and we have been unable to find it in the record.  However, the question of the State's liability on the whistleblower claim was submitted to the jury, and the State did not object to this verdict form.  Also, nothing in the record indicates the verdict would be only advisory.

Most salient to us is the dialogue that occurred when the jury sent back a question, asking why it was not being asked to decide damages on the whistleblower claim.  The district court proposed to inform the jury that it could not provide any additional instructions.  Counsel for the State thereupon objected as follows:

> I would object to providing that direction to the jury because I think they are confused about damages and that they should be given some guidance.  My proposal is that after question number three on the special verdict form that language be inserted to say if your answer to question number three is yes comma, the amount of damages will be determined by the Court.

The foregoing makes clear that the State understood the jury's role was to determine liability on the whistleblower claim, and the court's was to determine damages.

[13]Also, the conspiracy claim had been eliminated because only one defendant (the State) was remaining and a party cannot conspire with itself.  *See Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 233 (Iowa 1977).

[14]The district court entered findings of fact and conclusions of law that were largely taken verbatim from Smith's submission.  *See Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 97 (Iowa 2011) (discussing this practice).

The State appealed, challenging both recoveries. With respect to the emotional distress claim, it argued: (1) Smith's exclusive remedy was in workers' compensation, (2) the claim was the functional equivalent of defamation and thus barred by Iowa Code section 669.14(4), (3) Smith failed to present sufficient evidence of "outrageous" conduct to support a jury verdict, (4) Smith failed to present sufficient evidence of severe or extreme emotional distress, and (5) the damages awarded by the jury were excessive. Regarding the statutory whistleblower claim, the State urged: (1) Smith did not engage in protected conduct or, at most, the protected conduct was limited to his communications with President Geoffroy; (2) Smith did not lose his job or suffer other adverse work consequences in reprisal for his communications with President Geoffroy; (3) damages for emotional distress and harm to reputation are not recoverable under the whistleblower statute; and (4) the award of frontpay was speculative and inappropriate. We transferred the case to the court of appeals.

The court of appeals upheld the intentional infliction of emotional distress award in favor of Smith but set aside the whistleblower award. It rejected the State's argument that the workers' compensation statute foreclosed an emotional distress claim. It further found the conduct underlying the emotional distress claim went beyond defamation, and therefore, that claim was not "functionally equivalent" to defamation. The court of appeals also concluded substantial evidence supported a finding of outrageous conduct, a rational jury could find that Smith had experienced severe emotional distress, and the award of damages was not excessive. However, turning to the whistleblower claim, the court of appeals found that Smith had failed to prove a causal relationship between his disclosures to President Geoffroy and any actions of reprisal

taken against him. The court stressed the wrongful conduct predated the report to Geoffroy and continued after it, but did "not support an inference the wrongful conduct was 'as a reprisal for' Smith's disclosure of Reinig's possible violation of the law and ISU's policies to Geoffroy, especially since the 'retaliation' began months before Smith's disclosure."

Both ISU and Smith sought further review, and we granted their applications.

## II. Standard of Review.

The State contends the evidence was insufficient to support the jury findings that it was liable for intentional infliction of emotional distress and violations of Iowa Code section 70A.28(2). We review a district court's ruling on a motion for judgment notwithstanding the verdict for errors at law. Iowa R. App. P. 6.907; *Lee v. State,* 815 N.W.2d 731, 736 (Iowa 2012). "Our role is to decide whether there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.,* 783 N.W.2d 684, 687 (Iowa 2010). To justify submitting the case to the jury, substantial evidence must support each element of the plaintiff's claim. *Id.* We will find evidence is substantial if "reasonable minds would accept the evidence as adequate to reach the same findings." *Doe v. Cent. Iowa Health Sys.,* 766 N.W.2d 787, 790 (Iowa 2009).

The State also contends the intentional infliction of emotional distress claim was barred by either Iowa Code section 85.20 or Iowa Code section 669.14(4). Likewise, the State contends the district court could not award damages for reputational harm or "frontpay" under section 70A.28(5). "The district court's interpretation of a statute is

reviewed for correction of errors at law." *L.F. Noll Inc. v. Eviglo*, 816 N.W.2d 391, 393 (Iowa 2012).

Additionally, the State challenges the district court's finding that Smith suffered loss of his job as a result of statutorily protected whistleblowing. We review equitable matters, including the district court's award of damages, de novo. *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 43 (Iowa 2013) (considering de novo the district court's denial of civil penalties in an equity case); *Orr v. Mortvedt*, 735 N.W.2d 610, 613–15 (Iowa 2007) (reviewing de novo the district court's refusal to award damages in a case tried in equity); *Pflepsen v. Univ. of Osteopathic Med.*, 519 N.W.2d 390, 391–92 (Iowa 1994) (conducting a de novo review of an equity case and reversing the district court's award of damages). We give weight to the district court's findings of fact, especially the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(*g*); *Green v. Wilderness Ridge, L.L.C.*, 777 N.W.2d 699, 702 (Iowa 2010).[15]

**III. Analysis.**

**A. Intentional Infliction of Emotional Distress Claim.**

1. *Exclusivity of workers' compensation remedy.* The State argues the district court did not have subject matter jurisdiction over the intentional infliction of emotional distress claim because Smith's exclusive remedy lies under the Iowa Workers' Compensation Act (IWCA). *See* Iowa Code § 85.20 (making the rights of the employee under the IWCA exclusive in certain circumstances).

---

[15]Both parties concede in their respective appellate briefs that we should apply a de novo standard of review to the remedies entered by the district court on the statutory whistleblower claim.

The State's argument runs like this. First, we have held that "the term 'personal injuries,' as used in Iowa Code section 85.3(1), includes a mental injury standing alone," and "an employee's pure nontraumatic mental injury 'arising out of and in the course of employment' is compensable under chapter 85 of the Iowa Code." *See Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 851 (Iowa 1995). In *Dunlavey*, two employees sustained mental injuries as a result of what they alleged was a campaign of intimidation against them by their supervisors that resulted in increased stress, increased workloads, and harsh criticisms of their performance. *Id.* at 848.

Second, the State acknowledges that an intentional tort claim against a coworker would ordinarily not fall under exclusive IWCA jurisdiction. *See* Iowa Code § 85.20(2) (foreclosing non-IWCA claims against coemployees "provided that such injury . . . arises out of and in the course of such employment and is not caused by the other employee's gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another").

Yet the State notes that Smith's claims against all of the individual employees—Reinig, Dieterle, and Dr. Kushner—were dismissed pursuant to section 669.5(2)(*a*) and the parties' stipulations, and the State was substituted as a party. Therefore, the State argues no claims against coworkers exist, and section 85.20(1) rather than section 85.20(2) applies. *See id.* § 85.20(1) (foreclosing non-IWCA claims "[a]gainst the employee's employer" with no exception for gross negligence).

But Smith responds that he is actually complaining about intentional tortious acts committed by coworkers. Those coworkers, he observes, are no longer in the case only because of a technicality: Iowa Code section 669.5 requires the substitution of the State for individual

state employees when the latter are sued and were acting within the scope of their employment. Thus, section 669.5(2)(*a*) provides:

> Upon certification by the attorney general that a defendant in a suit was an employee of the state acting within the scope of the employee's office or employment at the time of the incident upon which the claim is based, *the suit commenced upon the claim shall be deemed to be an action against the state under the provisions of this chapter*, and if the state is not already a defendant, the state shall be substituted as the defendant in place of the employee.

*Id.* § 669.5(2)(*a*) (emphasis added).

We need not describe the parties' arguments further because we have previously decided the underlying issue. In *McGill v. Fish*, we held a claim for gross negligence against state coworkers could be pursued under the Iowa Tort Claims Act (ITCA) regardless of the substitution provision in the Act. 790 N.W.2d 113, 120 (Iowa 2010). In that case, a state university employee injured in the university's physical plant attempted to sue coemployees for gross negligence without complying with the ITCA's administrative claim provisions. *Id.* at 116. The employee argued that if he had to proceed under the ITCA, he would be denied all relief because the state would be substituted as defendant, and "section 85.20 bars all claims by injured workers against employers, including gross negligence claims." *Id.* at 120. We rejected this line of reasoning, and explained:

> [T]here is no indication whatsoever our legislature sought to bar coemployee gross negligence claims by state workers when it amended the procedures in the ITCA to require the state to be substituted as a defendant in the lawsuit once it is determined the coemployee acted in the course of employment.

*Id.* Thus, we reversed the district court, holding the injured employee's action should have been dismissed for failure to file an administrative claim as required by the ITCA. *Id.* at 121.

Applying *McGill* to this case, we agree with Smith that his claims against Reinig, Dieterle, and Dr. Kushner for intentional infliction of emotional distress are exempt from the IWCA under section 85.20(2) and do not lose that exemption because the State was substituted as a party under the ITCA.

2. *Immunity for defamation claims.* The ITCA does not permit claims arising out of "abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Iowa Code § 669.14(4). However, it does not foreclose claims for "intentional infliction of emotional distress." *See Dickerson v. Mertz*, 547 N.W.2d 208, 213–14 (Iowa 1996). Nonetheless, the State contends that Smith's cause of action for intentional infliction of emotional distress is the functional equivalent of a defamation claim and therefore barred by sovereign immunity. The State relies in part on our recent decision in *Minor v. State* to support this argument. *See* 819 N.W.2d 383, 406–08 (Iowa 2012).

In our previous cases, including *Minor*, we have made clear that if a claim is the functional equivalent of a section 669.14 exception to the ITCA, the State has not waived its sovereign immunity. *See id.*; *Trobaugh v. Sondag*, 668 N.W.2d 577, 584 (Iowa 2003); *Hawkeye By-Prods., Inc. v. State*, 419 N.W.2d 410, 411 (Iowa 1988); *Greene v. Friend of Ct.*, 406 N.W.2d 433, 436 (Iowa 1987). Our focus is not on the terminology used to describe the claim but instead on the "type of wrong inflicted." *Trobaugh*, 668 N.W.2d at 584 (internal quotation marks omitted). However, "[a] mere conceivable similarity between issues arising in the claim . . . and issues which may arise in a claim [exempted from the ITCA] is insufficient to establish the nexus of functional equivalency." *Id.* at 585 (declining to find a claim for legal malpractice was the functional

equivalent of false imprisonment, abuse of process, or malicious prosecution and therefore barred by the ITCA); *see also Minor*, 819 N.W.2d at 406.

In *Minor*, a mother whose child had been removed from her care sued the state and two Iowa Department of Human Services (DHS) employees after the child-in-need-of-assistance proceeding was dismissed and the child had been returned to her. 819 N.W.2d at 388. She alleged intentional infliction of emotional distress as one of her claims. *Id.* at 392. The essence of the claim was that in order to intentionally inflict emotional distress, a DHS worker obtained false information from a third party and presented it to the juvenile court. *Id.* at 407. As we put it, "[T]he basis of Minor's claims would not exist but for Grabe's alleged misrepresentation to the juvenile court." *Id.* at 408. After reviewing the facts of the case, we determined all of the mother's claims were the functional equivalent of misrepresentation or deceit. *Id.* at 407.

This case is different. We agree with the court of appeals that "[t]he underlying conduct here is far broader than false statements." It is true that some of the most distasteful conduct in this case took place when Reinig emailed Dr. Deisinger about Smith's alleged mental instability in order to divert attention from her own embezzlement of state funds. However, there was a good deal more. Reinig lied to Smith for years about putting him in for a promotion.[16] She isolated him on the job. She changed the source of funding for his job and denied him a

---

[16]Notably, the State does not argue on appeal that Smith's emotional distress claims are the functional equivalent of deceit or misrepresentation, or some combination of those torts plus defamation. We therefore have no occasion to decide whether this would be a ground to foreclose those claims.

salary increase warranted by his performance. In short, although Smith's emotional distress claim would undeniably be weaker if Reinig (and, to a lesser extent, Dieterle) had not attempted to besmirch his character, we agree with the court of appeals that the claim is based on a whole series of acts, only some of which involve statements about Smith.

"We have . . . been guided by interpretations of the [Federal Tort Claims Act (FTCA)], which was the model for the ITCA, when the wording of the two Acts is identical or similar." *Thomas v. Gavin*, 838 N.W.2d 518, 525 (Iowa 2013). Like the ITCA, the FTCA indicates the waiver of sovereign immunity does not apply to

> [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 2680(h) (2006).

To determine whether a claim "arises out of" one of the torts listed in § 2680(h), federal courts "look beyond a plaintiff's classification of the cause of action to examine whether the conduct upon which the claim is based constitutes one of the torts listed in § 2680(h)." *Sabow v. United States*, 93 F.3d 1445, 1456 (9th Cir. 1996); *see also United States v. Neustadt*, 366 U.S. 696, 703, 81 S. Ct. 1294, 1299, 6 L. Ed. 2d 614, 620 (1961) ("We must then look beyond the literal meaning of the language to ascertain the real cause of complaint." (Internal quotation marks omitted.)); *Limone v. United States*, 579 F.3d 79, 92 (1st Cir. 2009) ("The approach that we have outlined [to determine whether a claim arises out of a specifically enumerated tort] necessitates a fact-sensitive, case-specific inquiry. In performing that tamisage, substance trumps form; an inquiring court must look past the nomenclature employed by the plaintiff and focus on the actual nature of the plaintiff's grievance.");

*Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994) ("Even if a plaintiff styles a claim so that it is not one that is enumerated in section 2680(h), the plaintiff's claim is still barred when the underlying governmental conduct essential to the plaintiff's claim can fairly be read to arise out of conduct that would establish an excepted cause of action." (Internal quotation marks omitted.)).

The inquiry is "whether conduct that constitutes an enumerated tort is 'essential' to a plaintiff's claim." *Sabow*, 93 F.3d at 1456; *see also Thomas-Lazear v. F.B.I.*, 851 F.2d 1202, 1207 (9th Cir. 1988) ("Put another way, the Government's actions that constitute a claim for slander are essential to Thomas-Lazear's claim for negligent infliction of emotional distress."); *Metz v. United States*, 788 F.2d 1528, 1535 (11th Cir. 1986) (noting an action for intentional infliction of emotional distress was barred by § 2680 when "the government's actions that constitute a claim for false arrest" were essential to the plaintiff's claims for intentional infliction of emotional distress, and any differences between the two claims were "merely theoretical and not actual under the facts of the case").

Under the FTCA, factual overlap with a barred cause of action is not enough to bring a claim under the § 2680(h) immunity. *See Truman*, 26 F.3d at 595 (" '[T]he partial overlap between . . . two tort actions does not support the conclusion that if one is excepted under the Tort Claims Act, the other must be as well.' " (quoting *Block v. Neal*, 460 U.S. 289, 298, 103 S. Ct. 1089, 1094, 75 L. Ed. 2d 67, 75 (1983)); *Santiago-Ramirez v. Sec'y of Dep't of Def.*, 984 F.2d 16, 21 (1st Cir. 1993) ("[A]lthough appellant's claim for intentional infliction of emotional distress may overlap with a claim for false imprisonment, which is excepted, it does not follow that the first claim is also excepted.").

In cases alleging negligent or intentional infliction of emotional distress, when the court determines the underlying conduct is broader or more extensive than the conduct underlying a tort enumerated in § 2680(h), or the conduct is relevant for a reason not contemplated by the excepted tort, the plaintiff will be allowed to proceed with claims despite underlying conduct that overlaps with excepted torts. *See* David W. Fuller, *Intentional Torts and Other Exceptions to the Federal Tort Claims Act*, 8 U. St. Thomas L.J. 375, 390 (2011) ("[T]oday a consensus exists that—so long as they do not simply amount to artful attempts to 'plead around' excluded torts—[intentional infliction of emotional distress] claims are not barred by the FTCA.").

For example, in *Limone*, plaintiffs brought intentional infliction of emotional distress claims against the government after evidence came to light that government employees had elicited unreliable testimony that led to their conviction and incarceration for murder and then covered up exonerating evidence. 579 F.3d at 84–87. The government argued the emotional distress claim "arose out of" a malicious prosecution claim and was, therefore, barred by the FTCA. *Id.* at 87. The court disagreed and found the claim did not "rest on proof of conduct that traditionally comprises an excepted tort":

> [T]he conduct undergirding the plaintiffs' claims for intentional infliction of emotional distress is broader than that traditionally associated with the tort of malicious prosecution in that it includes malfeasance that postdates the scapegoats' convictions, such as efforts by the FBI to cover up its misdeeds (a topic to which we shall return). And, finally, the plaintiffs' intentional infliction claims require proof not only that the FBI's conduct was something akin to malicious, but also that it was extreme and outrageous. These are substantive distinctions.

*Id.* at 92–93. The court went on to note that although "the plaintiffs pleaded claims of malicious prosecution arising out of essentially the

same facts that supported their intentional infliction claims," this did not bar their claims as they had a right to "plead alternative theories of liability, and their exercise of that right did not debar them from an independent review of each set of claims." *Id.* at 93 (citation omitted). Finally, the court warned against comparing damages as a means of determining whether one claim arose out of another:

> In a related vein, the government posits that because the district court found that the same damages flowed from both the alleged malicious prosecution and the alleged intentional infliction of emotional distress, the latter claims necessarily arise out of the former. This is sophistry, pure and simple. The proper inquiry focuses upon the actor's tortious conduct, not the plaintiff's damages.

*Id.* (citation omitted).

To the same effect is *Sabow*. There, the family of a Marine brought claims of intentional infliction of emotional distress against the government following the Marine's death and a subsequent, allegedly flawed investigation into his death by military officials. 93 F.3d at 1449–50. The district court held the emotional distress claims, insofar as they were based on statements made to the wife of the deceased Marine during a meeting with Marine officers and an investigation into the medical license of the Marine's brother, were barred by § 2680(h). *Id.* at 1456–57. On appeal, the Ninth Circuit disagreed. *Id.* at 1457.

Although the district court had concluded the claims were covered by the § 2680(h) exception for defamation because the wife relied on the officers' use of the terms "crook" and "felon" regarding the Marine as the basis of her claim, the Ninth Circuit found this was too narrow a view. *Id.* It noted the spouse alleged a "far more extensive pattern of extreme and outrageous conduct" during the meeting. *Id.* As the Ninth Circuit explained, the statements may have been a part of the pattern of

conduct, but their relevance was not whether they were false but whether the content and abusive delivery of the statements were extreme and outrageous under the circumstances. *Id.*

Turning to the investigation into the status of the deceased's brother's medical license, the district court had concluded a letter drafted by a military general to the board of medicine accusing the doctor of unethical and criminal misconduct also arose out of defamation. *Id.* However, the court again found this view too narrow. *Id.* It noted the decision to investigate the doctor, the use of military staff to research ways in which the doctor's license could be attacked, and the threat "of impugning Dr. Sabow's integrity allegedly in response to Dr. Sabow's efforts to find out more about his brother's death" were broader bases for the emotional distress claim, and therefore, the claim was not foreclosed by § 2680(h). *Id.*; *see also Truman*, 26 F.3d at 595, 595 n.2 (refusing to bar a claim for intentional infliction of emotional distress when a plaintiff alleged the defendant's "numerous sexual insults, comments, and innuendos" caused her damages and noting the claim did not arise out of assault, battery, or defamation); *Gross v. United States*, 676 F.2d 295, 304 (8th Cir. 1982) (holding a claim for intentional infliction of emotional distress was not barred by the intentional torts exception of § 2680 despite the government's contention that the conduct that gave rise to the complaint involved "interference with contract rights, misrepresentation, malicious prosecution, and abuse of process").

On the other hand, when the plaintiff's negligent or intentional infliction of emotional distress claim does not allege conduct beyond an excepted tort, courts have disallowed the claim on the ground that it "arises out of" a tort under § 2680. In *Thomas-Lazear*, two individuals had applied unsuccessfully for a renewed banking license. 851 F.2d at

1204. They brought claims alleging an agent of the FBI, along with other federal defendants, "exerted political and economic pressures on officials . . . to persuade them to revoke [a] bank charter, and that they defamed [the plaintiffs] in the process." *Id.* The plaintiffs later sought to amend their complaint to add claims of invasion of privacy and negligent infliction of emotional distress. *Id.* In disallowing the additional claims, the court concluded the plaintiffs had attempted to "fashion the slander and libel claims into a claim for negligent infliction of emotional distress by saying the officials were negligent in not foreseeing the effect of their slander in causing emotional distress to [the plaintiffs]." *Id.* at 1206. The court noted "the Government's actions that constitute a claim for slander are essential to Thomas-Lazear's claim for negligent infliction of emotional distress" and found there was no other conduct alleged by the plaintiffs on which they could base their emotional distress claims. *Id.* at 1207.

Likewise, in *Metz*, a federal employee asserted intentional infliction of emotional distress claims against the federal government after he allegedly became the target of a conspiracy precipitated by his complaints about misconduct of fellow employees. 788 F.2d at 1529–30. When Metz voiced his frustrations with supervisors, they stated they believed he posed a threat to their personal safety. *Id.* at 1530. Based on the supervisors' complaints, Metz was charged with making terroristic threats—a felony. *Id.* He was arrested, transported to an Army mental hospital for a psychiatric evaluation, and detained there for two days. *Id.* Despite clearing all mental evaluations, Metz was placed on involuntary sick leave and eventually terminated. *Id.*

The court concluded his emotional distress claim was barred under the intentional torts exception to the FTCA:

Mr. Metz claims that the seizure of his person renders the government liable for intentional infliction of emotional distress . . . . Applying the *Block v. Neal* analysis, it is clear that any injury Metz has suffered as a result of these alleged torts stems from Metz's false arrest, a tort expressly exempted from the coverage of the FTCA. In other words, the government's actions that constitute a claim for false arrest are essential to Mr. Metz's claims for intentional infliction of emotional distress and intrusion into seclusion. There is no other government conduct upon which such claims can rest. Thus, even though the claims may be distinct from a false arrest claim, any such difference is merely theoretical and not actual under the facts of this case.

*Id.* at 1534–35 (footnotes omitted).

In a similar case, *Edmonds v. United States*, a plaintiff working for the FBI alleged she was fired for whistleblowing when she reported her security concerns about another agent. 436 F. Supp. 2d 28, 30–32 (D.D.C. 2006). She also claimed negligent infliction of emotional distress and alleged "the Government disclosed her identity, the nature of her work, her accusations of misconduct and security breaches, and information relating to the resulting investigation," which

injured her reputation, thereby generating ill-will toward her in the United States and Turkey and causing her to fear for the safety of herself and her family. Further, the injury to her reputation allegedly prevented Ms. Edmonds from traveling to Turkey to deal with her properties, businesses, and business opportunities, and prevented her from obtaining a new job.

*Id.* at 36. The court concluded the complained-of conduct was the FBI's disclosure of her information and the essence of her emotional distress claim "ar[o]se from defamation." *Id.* at 36–37. As a result, the court found it barred by § 2680(h). *Id.* at 37; *see also Vander Zee v. Reno*, 100 F.3d 952, 1996 WL 625346, at *5 (5th Cir. 1996) (unpublished table decision) (finding a plaintiff's claims for negligent and intentional infliction of emotional distress arose "out of his arrest and prosecution,

allegedly coerced resignation from his job, and the terms of the settlement agreement, which we have already indicated must be understood to be claims for torts specifically enumerated under section 2680(h)"); *Doe v. United States*, 83 F. Supp. 2d 833, 839 (S.D. Tex. 2000) (barring a plaintiff's claim for intentional infliction of emotional distress when the only conduct complained of was the publication of false statements about the plaintiff and "the government's conduct, in *all* aspects, can fairly be read as giving rise to the intentional tort of libel or slander").

We believe this case falls on the side of those federal precedents where the intentional infliction of emotional distress claim has been allowed to go forward. The present case involves a "pattern" of conduct transcending allegedly false statements about the plaintiff. *See Sabow*, 93 F.3d at 1457. In fact, the relevance of the emails to Dr. Deisinger is not so much whether they were factually false. *See id.* (noting the relevance of the statements was not whether they were defamatory, but whether their content and allegedly abusive delivery were extreme and outrageous). In many instances, Reinig (or Dieterle) carefully worded what they said. The emails were written so as to be conveying personal fears instead of making factual statements about Smith. But particularly after Dr. Deisinger assured them things were under control and this was just a personnel matter, a jury could reasonably conclude that the barrage of emails to Dr. Deisinger was a calculated and malicious attempt to take the heat off themselves and make Smith's life miserable.

We are not presented with a situation where, apart from the defamatory statements, "[t]here is no other government conduct upon which [Smith's emotional distress] claim[] can rest." *See Metz*, 788 F.2d at 1535; *see also Thomas-Lazear*, 851 F.2d at 1207. Nor does Smith's

claim arise only from the disclosure of false information by the defendants. *See Edmonds*, 436 F. Supp. 2d at 36. There was additional wrongful conduct that was not merely derived from false statements. The conduct engaged in by the defendants was "broader than that traditionally associated with" defamation and, therefore, cannot be said to arise out of the excluded tort of defamation, even if some of the conduct of the two claims overlaps. *Limone*, 579 F.3d at 93. Accordingly, we find that Smith's emotional distress claim was not barred by section 669.14(4) of the ITCA.

3. *Outrageous conduct.* In order for a plaintiff to successfully bring a claim of intentional infliction of emotional distress, he or she must demonstrate four elements:

> "(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress."

*Barreca v. Nickolas*, 683 N.W.2d 111, 123–24 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)).

The plaintiff must establish a prima facie case for outrageous conduct, and "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (internal quotation marks omitted). "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Restatement (Second) of Torts § 46, cmt. *h,* at 77 (1965).

The State argues that Smith failed to present evidence rising to the level of outrageous conduct. We have stated the standard of outrageous conduct "is not easily met, especially in employment cases," and discussed the differences between mere bad conduct and outrageousness as follows:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156–57 (Iowa 1996) (internal quotation marks omitted).

"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990) (citation omitted). Despite our caselaw that indicates an employer "has a duty to refrain from abusive behavior toward employees," *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118–19 (Iowa 1984), we have often found that conduct by employers and coworkers did not rise to the level of outrageous conduct.

We examined whether an employer's conduct toward an employee who ultimately committed suicide was outrageous in *Cutler*. In that case, an attorney was working for a law firm when he became unable to practice law and was later hospitalized due to severe depression. *Cutler*, 473 N.W.2d at 179. The attorney was placed on disability status by his firm and retained a lawyer to handle any issues related to his tenure with the firm; he requested all communication regarding his employment go

through his attorney. *Id.* After his release from the hospital, the attorney sought to return to his firm part-time, but the partners refused to allow him to return until the attorney consented to their speaking with his doctor. *Id.* at 180. At a partnership meeting, after voicing concerns about the attorney's health and the clients he would be assisting, several partners determined the attorney could not return to work until a full partnership meeting had been held to consider the matter. *Id.* A letter was sent to the attorney with the minutes from the partnership meeting. *Id.* Because of concerns as to how the attorney might receive the information in the letter, another firm member contacted one of the attorney's close friends and informed him of the letter and its content. *Id.* The friend contacted the attorney's wife with the information, and she, in turn, contacted another firm member. *Id.* The spouse alleged the firm member was abrupt with her, but assured her the attorney was not being expelled from the firm. *Id.* She alleged he said, "Look, Karen, we've got a ___ ___ business to run here." *Id.* at 184 n.3. The night after she spoke with the firm member, the attorney's spouse informed her husband he would be receiving the letter, and he appeared to accept the information calmly. *Id.* However, two days later the attorney committed suicide, and the letter from the firm was found with his body. *Id.* His wife filed an intentional infliction of emotional distress claim against the firm. *Id.* at 183. We concluded that neither the letter nor the alleged statement made by the firm member to Mrs. Cutler rose to the level of outrageous conduct. *Id.* at 183–84.

In *Vinson,* another case arising in the employment context, we likewise did not find sufficient evidence to support outrageous conduct. *See* 360 N.W.2d at 119. There, after the plaintiff questioned her employer's seniority policy and expressed concern over pay issues, she

was singled out by the defendants for special scrutiny and became the target of a "campaign of harassment." *Id.* The campaign included delaying the plaintiff's start time, subjecting her to a time study that did not allow her the same amount of slack time as other employees, instructing her to inaccurately complete time records, accusing her of falsifying time records, denying her request to have her issues taken to the school board, discharging her on grounds of dishonesty, and reporting the incident to a prospective employer despite knowing the plaintiff had not acted dishonestly and knowing it would negatively affect her chances of acquiring new employment. *Id.* Though we indicated a jury could have found the "defendants engaged in a deliberate campaign to badger and harass plaintiff" and that the "defendants' actions were petty and wrong, even malicious," we concluded the trier of fact could not "reasonably conclude that the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

Similarly, we did not find conduct rising to the level of outrageousness in *Northrup v. Farmland Industries, Inc.*, 372 N.W.2d 193, 198–99 (Iowa 1985). In that case, the plaintiff was an alcoholic and admitted he was fired by his employer for that reason. *Id.* at 199. However, he argued his firing for alcoholism, and the events leading up to his firing, constituted outrageous conduct. *Id.* at 198. He testified his supervisor had yelled at him, told him he would not tolerate any more of his behavior, hinted that he had falsified documents, and made accusations that he had lied. *Id.* We concluded the supervisor's behavior did "not appear to be anything unusual in an employer–employee relationship." *Id.* We observed that a "reasonable level of tolerance is required" when evaluating whether conduct is outrageous.

*Id.* We found the relationship between the employer and employee in *Vinson* had "considerably 'rougher edges'" than in *Northrup* and concluded Northrup's firing for alcoholism, even with the additional conduct alleged, failed to establish outrageous conduct. *Id.* at 199.

The evidence of outrageousness did not even present a close call in *Fuller*. There, the plaintiff was seeking the business agent seat in the union. *Fuller*, 567 N.W.2d at 421. The union member whose seat the plaintiff was seeking made a false report that the plaintiff had been driving while intoxicated. *Id.* The police stopped the plaintiff, but he was released after the officers determined he was not intoxicated. *Id.* When the plaintiff filed charges against this union member with the union, the union stopped assigning work to the plaintiff. *Id.* Nonetheless, we quickly dispensed with the plaintiff's emotional distress claim, stating, "In no way could the conduct alleged here qualify under" the definition of outrageous conduct. *Id.* at 423; *see also Van Baale*, 550 N.W.2d at 154–55, 157 (indicating a police officer's firing after he entered a *nolo contendere* plea on a domestic abuse charge was not outrageous conduct even when his supervisor assured him that making such a plea would ensure he was not fired); *Reihmann v. Foerstner*, 375 N.W.2d 677, 681 (Iowa 1985) (finding no outrageous conduct when a supervisor used his influence to move the plaintiff's office to another city).

Although we have never before found an employee's claim of intentional infliction of emotional distress against an employer raised a jury question, the court of appeals did so in *Blong v. Snyder*, 361 N.W.2d 312, 317 (Iowa Ct. App. 1984). In *Blong*, the court of appeals noted

> the record shows that plaintiff was initially dismissed for filling out his time cards in accordance with his supervisor's instructions. After he was finally able to get his job back, plaintiff was subjected to verbal abuse on almost a daily

basis. He was accused of stealing, wasting time, intentionally breaking his machine, intentionally producing inferior parts, violating fifteen company rules, and "playing with himself" in the restroom. All of these accusations were apparently groundless. Furthermore, plaintiff was assigned extra work without being given the proper patterns or tools for the job and was then berated, threatened, and disciplined for his inability to properly complete the task.

*Id.* The court concluded that

[w]hile any of the individual instances alone may be no more than insulting and humiliating, the jury could properly conclude that the whole of defendant's actions over the four-month period were a course of conduct "exceeding all bounds usually tolerated by decent society."

*Id.*

Although we reaffirm the foregoing precedents and believe the issue is a close one, we conclude the conduct here exceeded a "deliberate campaign to badger and harass" Smith and crossed the line into outrageous conduct. *Vinson*, 360 N.W.2d at 119. A reasonable jury could have concluded "the whole of defendant's actions" in this case constituted "a course of conduct exceeding all bounds usually tolerated by decent society." *Blong*, 361 N.W.2d at 317 (internal quotation marks omitted). The district court properly performed its gatekeeping function here.

This case presents the confluence of several factors. First, the three individuals who mistreated Smith (Reinig, Dieterle, and Dr. Kushner) were generally in a position of authority over him. *See Blong*, 361 N.W.2d at 316 ("We agree that plaintiff's status as an employee entitled him to more protection from insultive or abusive treatment than would be expected in interactions between two strangers."); *Vinson*, 360 N.W.2d at 118 (indicating "the court should consider the relationship between the parties" when making an outrageous conduct determination); *see also Contreras v. Crown*

*Zellerbach Corp.*, 565 P.2d 1173, 1176 (Wash. 1977) ("The relationship between the parties is a significant factor in determining whether liability should be imposed."); Restatement (Second) of Torts § 46 cmt. *e*, at 74 ("The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.").

In addition, the conduct included, but also went beyond, typical bad boss behavior such as discrimination in pay, isolation of the employee, removal of the employee from work assignments, misrepresentations about promotions, and even falsification of records. What is striking about this record, and presumably resonated with the jury, were two things. First, Reinig engaged in unremitting psychological warfare against Smith over a substantial period of time. She tried to have him treated as a scary and mentally unstable outcast. Second, she did all this to cover up what basically amounted to her theft from ISU.[17] For these reasons, under the special circumstances of this case, we agree there was sufficient evidence of outrageous conduct to submit Smith's claim to the jury.

The State urges us to be hesitant to subject university employees to liability for reporting security concerns about individuals to campus police. This is a legitimate point. But several things should be noted here. Reinig did not just report concerns. Even after Dr. Deisinger clearly acknowledged and understood what Reinig was saying, she went back to him repeatedly to demean Smith, even though she had nothing

---

[17]Although Reinig's theft obviously was contrary to the interests of ISU, we note again that the State stipulated at the close of evidence that Reinig had acted in the course of her state employment at all relevant times.

new to say or report. And she enlisted Dieterle in her campaign. Additionally, as we point out above, one thing that sets this case apart is the strong evidence that Reinig's motivation had nothing to do with a true safety concern and everything to do with getting the person who had stumbled onto her misconduct in trouble. Moreover, the State's effort to highlight the importance of campus safety cuts in two directions. It suggests that reports to university police ought to have a wide berth of legal protection, but it also shows that such reports can be misused because of current sensitivities.

The State further argues that because of section 669.14(4), we need to remove any defamatory conduct from the mix before considering whether Smith has presented enough to get to the jury. Yet the State cites no authority here other than an off-point case dealing with privileged conduct. *See Lewis v. Sch. Dist. No. 70*, 523 F.3d 730, 746–47 (7th Cir. 2008) (holding that privileged statements cannot be considered in evaluating outrageousness of the defendant's conduct). Iowa Code section 669.14(4) does not immunize conduct per se; it immunizes claims "arising out of" certain categories of conduct. We think it is appropriate to take into account Reinig's statements about Smith in considering whether the overall conduct was outrageous, so long as Smith's claim— fairly construed—is not primarily about those statements. True, we rejected Minor's claims because they "would not exist but for Grabe's alleged misrepresentation to the juvenile court." *Minor*, 819 N.W.2d at 408. However, this language was intended to emphasize the primacy of the misrepresentation, not establish a strict but-for standard under which a claim against the State cannot go forward unless it would be viable without the inclusion of conduct that by itself would fall within section 669.14(4).

4. *Extreme or severe emotional distress.* The State further argues that Smith failed to prove the third prong of his intentional infliction of emotional distress claim—that he suffered from severe or extreme emotional distress. *See Barreca*, 683 N.W.2d at 123–24. According to the State, Smith claimed only that he was under emotional strain, suffered anxiety, and sought counseling, and those issues are not sufficiently severe to meet the standard for recovery in Iowa. Smith responds that he experienced mental trauma over an extended period of time, substantiated by his psychologist, that manifested itself physically when he became sick to his stomach and light-headed. Smith suffered from insomnia, the inability to eat properly, and weight loss.

Our caselaw requires plaintiffs to "establish more than the fact that they felt bad for a period of time." *See Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 71 (Iowa 2002) (internal quotation marks omitted). "Our cases that have found substantial evidence of emotional harm have had direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct." *Steckelberg v. Randolph*, 448 N.W.2d 458, 462 (Iowa 1989). When seeking to define the contours of severe or extreme emotional distress, we have looked to the Restatement (Second) of Torts for guidance. *See Poulsen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981). The Restatement notes:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that

> no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

Restatement (Second) of Torts § 46 cmt. *j*, at 77–78.

We have found a plaintiff had enough to get to the jury on this point when he suffered from nausea, difficulty breathing, and acute myocardial ischemia. *Meyer v. Nottger*, 241 N.W.2d 911, 915–16, 918–19 (Iowa 1976). Similarly, claims that the plaintiff endured abdominal cramps, weight loss, and crying constituted sufficient evidence to generate a jury question. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 855, 860 (Iowa 1973). Testimony that plaintiff was petrified, shocked, and hospitalized for near-nervous breakdown was also enough to constitute "substantial evidence that plaintiffs suffered severe or extreme emotional distress." *Randa v. U.S. Homes, Inc.*, 325 N.W.2d 905, 908 (Iowa Ct. App. 1982).

By contrast, the evidence of severe and extreme emotional distress was insufficient when the plaintiff testified only that for "at least a month or two" he " 'was very, very down,' 'was feeling super badly' and 'felt that he lost everything.' " *Poulsen*, 300 N.W.2d at 297. We also found the evidence insufficient when the plaintiff's distress "consisted of headaches, insomnia, and loss of appetite," and she had not been treated by a doctor, taken any medications, or suffered any weight loss. *Millington v. Kuba*, 532 N.W.2d 787, 794 (Iowa 1995); *see also Ette*, 656 N.W.2d at 71 (insufficient showing of severe or extreme emotional distress when one plaintiff "testified the anxiety made him unable to work for three days and troubled him for nearly six months," and another plaintiff stated he was uncomfortable, "a little scared," and "tired

and hungry"); *Ollinger v. Bennett*, 562 N.W.2d 167, 173 (Iowa 1997) (evidence was insufficient when distress was limited to exacerbation of a preexisting high blood pressure problem and sleeplessness); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (insufficient evidence to submit claim to jury when the evidence of emotional distress included being bothered by creditors late in the evening, making enemies of friends by attempting to collect accounts receivable early, feeling degraded by entering bankruptcy, and the plaintiff's mother noted he " 'wasn't as interested or he was downhearted more or less' " and " 'depressed' " about the decline in his business).

Smith manifested symptoms that were more significant than merely feeling down or depressed. *Cf. Poulsen*, 300 N.W.2d at 297; *Harsha*, 346 N.W.2d at 801. Rather, Smith suffered "physical symptoms of the distress" and "a notably distressful mental reaction" as a result of the defendants' conduct. *Steckelberg*, 448 N.W.2d at 462. The record shows that in August 2007, to deal with his stress at work, Smith began meeting with a psychologist who diagnosed him with extreme stress and anxiety. All this happened before Smith consulted with an attorney or filed a lawsuit. Smith also became physically ill and light-headed at one point, was not sleeping, and lost weight. There is also some irony in the State's position that Smith did not suffer severe emotional distress, given Reinig's communications about his reaching a "breaking point." The evidence in the record met the level of severity necessary to generate a jury question.

5. *Damages.* The State further argues that the damages awarded by the jury were excessive and not supported by the evidence. It contends the $500,000 in damages was considerably higher than what we have recognized as within the range of reasonableness. Smith

responds that the damages in this case were justified because his injuries persisted over a long period of time, were inflicted in a continuous manner, and caused severe emotional injury to a particularly susceptible person.

When reviewing a jury's award of emotional distress damages, we have stated:

> [T]he amount of an award is primarily a jury question, and courts should not interfere with an award when it is within a reasonable range of the evidence.
>
>    . . . .
>
>    . . . [I]t is generally recognized that damages for pain and suffering are by their nature "highly subjective" and are not "easily calculated in economic terms." Nevertheless, an award for emotional-distress damages is not without boundaries, but is limited to a reasonable range derived from the evidence. Accordingly, it is helpful in considering a claim of excessive damages to consider the rough parameters of a range from other like cases. Of course, we have said that precedent is of little value when determining the excessiveness of a verdict. Yet this approach does not mean other cases should not be used to establish broad ranges from which to examine particular awards of emotional-distress damages.

*Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 772 (Iowa 2009) (citations omitted). We have noted "emotional-distress damages tend to range higher in employment cases . . . involving egregious, sometimes prolonged, conduct." *Id.*

"The determinative question posed is whether under the record, giving the jury its right to accept or reject whatever portions of the conflicting evidence it chose, the verdict effects substantial justice between the parties." *Kautman v. Mar-Mac Cmty. Sch. Dist.*, 255 N.W.2d 146, 148 (Iowa 1977).

> Another consideration for this court in examining the trial court's determination is the "fact the trial court, with benefit of seeing and hearing witnesses, observing the jury and

having before it all incidents of the trial, did not see fit to interfere [with the jury's verdict]."

*Foggia v. Des Moines Bowl-O-Mat, Inc.*, 543 N.W.2d 889, 891 (Iowa 1996) (quoting *Olsen v. Drahos*, 229 N.W.2d 741, 743 (Iowa 1975)).

In *Jasper*, we concluded the district court had not abused its discretion in granting the defendant a new trial following a damage award of $100,000 after comparing that award with a sampling of other emotional distress cases. 764 N.W.2d at 772–73. However, in that case, the worker suffered distress only for a short period of time when her employment from a daycare center was terminated and she was briefly "denied access to her children" and then "confronted by police before she left the day-care-center with her children." *Id.* at 773. We concluded that because this was a "single incident of wrongful-termination conduct producing the more common consequences of any involuntary loss of employment," Jasper's damages should fall into the "lower range." *Id.* We pointed to Jasper's short time of employment with the center, her young age and ability to become reemployed within a short period of time, the lack of medical testimony to support her emotional distress claims, and the lack of evidence that the emotional distress continued for any prolonged period of time. *Id.*

Although the State contends that *Jasper* sets an "upper limit" to the reasonable range for emotional distress damages at $200,000, we actually indicated higher damages amounts may be supported. *Id.* at 773. ("[A] broad range of emotional-distress damages in all employment-termination cases may support awards of $200,000 *and beyond . . . .*" (Emphasis added.)).

Furthermore, this is not a case like *Jasper* where the conduct was directed at a newly employed individual and limited to a single incident

with no long-term distress. *Cf. id.* Rather, Smith was subjected to wrongful conduct for an extended period of time in a job he had held for nearly a decade. Smith was vulnerable to stress due to the responsibilities of taking care of his incapacitated spouse. The evidence shows that Reinig (and, to a lesser extent, Dieterle) were aware of that vulnerability and took advantage of it. Smith sought treatment from a psychologist and was diagnosed as suffering from extreme stress and anxiety that the doctor indicated was significantly impacting his life. A juror could easily read Smith's lengthy written grievances and conclude, at a minimum, he was despondent and his life was miserable. In fact, we would not be surprised if jurors went through that thought process in the jury room.

While a lesser verdict could also have been in the range of reasonableness, "we think the jury was in the best position to judge the credibility of the witnesses and to make the judgment call about what the noneconomic elements of damages were worth," and we will "not set aside a verdict simply because we might have reached a different conclusion." *Matthess v. State Farm Mut. Auto. Ins. Co.*, 521 N.W.2d 699, 704 (Iowa 1994). We do not find the verdict excessive.

**B. Section 70A.28(2) Claim.** We next turn to the statutory whistleblower claim. Iowa Code section 70A.28(2) provides, in part:

> A person shall not discharge an employee from or take or fail to take action regarding an employee's appointment or proposed appointment to, promotion or proposed promotion to, or any advantage in, a position in a state employment system administered by, or subject to approval of, a state agency as a reprisal for . . . a disclosure of information to any other public official or law enforcement agency if the employee reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

As we have noted, the parties agreed that liability would be submitted to the jury and the court would determine damages.

The relevant liability jury instruction read as follows:

INSTRUCTION NO 11

Plaintiff alleges that Iowa State University took action against him in reprisal for reporting certain matters to a public official. In order to recover on this claim, the Plaintiff must prove all of the following

1. The Plaintiff reported to a public official, Iowa State University President Gregory Geoffroy that Pamela Reinig had committed a violation of a law or rule, mismanagement, a gross abuse of funds or an abuse of authority,

2. That Plaintiff reasonably believed the matter he was reporting,

3. That Iowa State University took action or retaliated against the Plaintiff after August 16, 2007, when the president received the Plaintiff's appeal of his first grievance[,]

4. That Defendant's conduct was a proximate cause of the Plaintiff's damage,

5. The amount of damage[.]

If the Plaintiff has failed to prove any of these propositions, the Plaintiff is not entitled to damages. If the Plaintiff has proved all of these propositions, the Plaintiff is entitled to damages in some amount.

The jury found that "Iowa State University retaliate[d] against Plaintiff as explained in Instruction No 11 because he reported certain matters to a public officer." The district court agreed with this determination and awarded $784,027.40 in damages in addition to the jury award of $500,000 for severe emotional distress.[18] The $784,027.40 included $150,000 in damage to reputation and $634,027.40 in loss of

---

[18]The court found that Smith had incurred the same $500,000 in emotional distress damages for the Iowa Code section 70A.28 violation, but declined to make a duplicate award.

income based upon Smith's termination from employment in August 2010.

The State's first argument is that Smith did not engage in protected conduct under section 70A.28(2) because he was acting for his own benefit when he pursued the grievance process with President Geoffroy. Smith responds that the State did not preserve error on this claim, and we agree. Jury Instruction No. 11, which the State has not challenged on appeal, is the law of the case. *See Pavone v. Kirke*, 801 N.W.2d 477, 489 (Iowa 2011).[19] While the instruction adopted the State's position that the only "public official" involved in the matter was President Geoffroy, *see Hegeman v. Kelch*, 666 N.W.2d 531, 534–37 (Iowa 2003) (holding that a college dean is not a public official under Iowa Code section 70A.28), it did not contain any requirement that Smith had to have been acting in a disinterested manner when he went to President Geoffroy.

The State next argues there was no causal connection between Smith's loss of his job in 2010 or any other harm he suffered and his communications with President Geoffroy. Smith concedes the State preserved error on this argument. Citing to cases we have decided involving common law claims of discharge in retaliation for protected conduct, the State argues that Smith had to show the reports to President Geoffroy were a "determinative factor" in his losing his job in 2010. *See Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009); *Jasper*, 764 N.W.2d at 767; *Fitzgerald v. Salsbury Chem., Inc.*, 613

---

[19]The State did object to Instruction No. 11 below, stating, "[W]e don't believe that you can meet the definition of submitting a report to a public official simply by pursuing an appeal of a grievance to that individual." However, it has not pursued that instructional challenge on appeal. *See Pavone*, 801 N.W.2d at 489.

N.W.2d 275, 289 (Iowa 2000); *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 301–02 (Iowa 1998).

Smith, by contrast, insists that Iowa Code section 70A.28(2), which requires that the action have been undertaken "as a reprisal for" the protected conduct, incorporates a more relaxed burden of proof. He urges that we interpret section 70A.28(2) to be consistent with the Federal Whistleblower Protection Act, which requires only that an employee prove a protected disclosure was a "contributing factor" in the personnel action, with the burden shifting then to the employer to prove by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure. *See* 5 U.S.C. § 1221(e). Smith also maintains that the State failed to preserve error on its claim that a "determinative factor" standard applies here.

We think both Smith and the State have overlooked an important point. As we read Instruction No. 11, it did not contain a requirement that the retaliation be causally connected to Smith's reporting to President Geoffroy. It only required that the retaliation occurred *afterward.* Thus, the third element of this marshaling instruction stated that Smith had to prove "[t]hat Iowa State University took action or retaliated against the Plaintiff after August 16, 2007, when the president received the Plaintiff's appeal of his first grievance."

Of course, this does not resolve the question of Smith's damages, which were determined by the district court and are subject to our de novo review. The statute still requires that any adverse employment consequences have been in reprisal for protected conduct, and it was the district court's job in calculating damages to determine exactly what those consequences were. The district court found that Smith's loss of his job in 2010 was in retaliation for Smith's reporting to President

Geoffroy. It is not clear what causation standard the district court applied.[20]

The State makes two contentions. For one thing, it maintains there is no evidence that Smith's communications with President Geoffroy, as opposed to other reports he made to other people at other times, triggered any adverse consequence for his employment, including his 2010 job loss. Second, it maintains there is no evidence that Smith's loss of his job in 2010 was retaliatory at all. The court of appeals agreed with the State's first point, ruling as follows:

> We agree with the [district] court there was a continuous pattern of wrongful conduct against Smith by Reinig, Dieterle, and [Dr.]Kushner. . . . Although these actions were wrongful and probably retaliatory, they bear no relation to Smith's report to President Geoffroy other than preceding it in time. The wrongful conduct continued after Smith's report to President Geoffroy. Smith has demonstrated Reinig, [Dr.] Kushner, and Dieterle separately and in various combinations acted against him over a period of more than two years. The fact Smith's report to President Geoffroy occurred during this period does not support an inference the wrongful conduct was "as a reprisal for" Smith's disclosure of Reinig's possible violation of the law and ISU's policies to Geoffroy, especially since the "retaliation" began months before Smith's disclosure. We conclude Smith failed to prove a causal relationship between his disclosure to a public official and the conduct of Reinig, Dieterle, and [Dr.] Kushner. Without proof their conduct was "as a reprisal for" Smith's protected disclosure, Smith's claim under section 70A.28 fails.

---

[20]The liability instruction for the statutory whistleblowing claim required the jury to find that Smith had suffered some harm. Thus, the fourth element of Instruction No. 11 read, "The Defendant's conduct was a proximate cause of the Plaintiff's damage." We fully agree that this instruction is the law of the case.

However, the issue for present purposes is not whether Smith had suffered *some* harm, but what damages are recoverable, an issue that was reserved for the court and as to which our review is de novo. Furthermore, the proximate cause language in Instruction No. 11 would not be relevant to that inquiry because the present question is not (a) whether Smith suffered damages when he lost his job, but (b) whether his job loss can be part of his damages recovery because it was in retaliation for Smith's reporting to President Geoffroy. No causation standard for that issue appears in either the jury instructions or the court's posttrial findings of fact and conclusions of law.

Like the district court and court of appeals, we conclude there is ample evidence that Smith suffered retaliation for having raised Reinig's alleged financial misconduct *with others at ISU*, e.g., Dr. Kushner. But we also agree with the court of appeals that there is no evidence Smith suffered retaliation for reports of financial improprieties *to President Geoffroy*. In his answering brief on appeal, Smith simply ignored this distinction between retaliation for whistleblowing generally and retaliation for reporting to a "public official." In his application for further review to this court, written after the court of appeals decision, Smith argued that reasonable minds could conclude that the post-August 16, 2007 retaliation was in reprisal for "Smith's more recent reporting as opposed to his earlier reporting at lower levels."

To be clear, Smith's letters to President Geoffroy did not even mention Reinig's alleged financial improprieties. They focused on Smith. At most, the record allows one to conclude that Smith made an oral report on the billing issue on August 28, 2007, to President Geoffroy's executive assistant, which led to the internal audit. Yet even if we assume for the sake of argument that the oral report to President Geoffroy's assistant in August 2007 could qualify as a report to a public official under section 70A.28(2),[21] and regardless of the causation

---

[21]At trial, Smith objected to Instruction No. 11. Among other things, he urged:

> The instruction limits—or appears to limit the—the reporting to the president to the plaintiff's appeal of his first grievance. The evidence shows that there was reporting to the president through his [executive] assistant, Dr. Tahira Hira. And we contend that that would constitute a report to the president in this context and that that instruction should— even if the president is the only public official that we're considering, that instruction should allow for reporting through his [executive] assistant, Dr.—Dr. Hira.

Smith has not challenged Instruction No. 11 on appeal. We need not resolve today the question whether a report to the president's executive assistant constitutes a report to the president under the circumstances present here.

standard, we cannot find on our de novo review that Smith's loss of his job in the downsizing that occurred three years later was "as a reprisal for" this report.

To begin with, there is no evidence in the record that anything that befell Smith can be traced to this particular report. The lowball pay raise, the change in the funding source for Smith's salary, the isolation of Smith, the removal of some of his job responsibilities, and the trumped-up reports to Dr. Deisinger all *preceded* the August 2007 meeting. It is true that other reports to Dr. Deisinger were made after that meeting, but they were simply more of the same thing. After Reinig was forced out at the beginning of 2008, Smith acknowledges that things got better. And this was still more than two years before Smith lost his job.

In his own trial testimony, Smith did not connect his 2010 job loss to his August 2007 report to President Geoffroy's executive assistant on Reinig. To the contrary, he testified as follows:

> Q. How about the—the subsequent restructuring and elimination of the ECM and the elimination of your job? A. I believe that's just *part of the continuum.*

(Emphasis added.)

Dr. Wickert's explanation for his decision to downsize ECM during the state budget crisis that began in the fall of 2009 was a logical one. As he related, he had to cut $2 million from the College of Engineering budget, academics had already suffered cuts, and he wanted to preserve educational programs for students ahead of magazines and newsletters. The evidence also showed that the communications and marketing department for the College of Engineering was far larger than similar departments at comparable engineering schools. The only counter to

Dr. Wickert's testimony came in the form of supposition from some ECM employees that it seemed retaliatory to impose severe cuts on a department that received payments to cover its costs, mostly from other ISU departments. But it was unrebutted that the department never covered all its own costs, let alone earned enough to support any of ISU's academic programs.

Furthermore, Dr. Wickert had nothing to do with Reinig's fraud or any of the events of 2007; he did not even become dean until 2009. By that time, Reinig was long gone; she had resigned under threat of immediate termination. While Dr. Wickert had been briefed on Smith's grievances, there is no evidence that Dr. Wickert was even aware of Smith's reporting on Reinig's alleged financial misconduct. We see no substantial evidence, or even a plausible argument, that his downsizing decision was made in 2010 to retaliate for Smith's report to President Geoffroy's executive assistant regarding Reinig in 2007.[22]

There remains Smith's contention that the decision not to retain him in 2010 as the only communications specialist in the new ECR department was retaliatory. It is undisputed that Dr. Wickert, a newcomer, made this decision based upon information provided by a disinterested search committee. Smith does not challenge the composition of the search committee or contend it was biased. Dr. Wickert cited four areas noted by the search committee in which Strawn rated ahead of Smith. Smith did not dispute Strawn's relative

---

[22]In reaching this conclusion, we acknowledge the district court's finding that the testimony of Dieterle and Dr. Kushner was "largely not credible." Our conclusion is not premised on their credibility. The downsizing decision and the follow-on decision to retain Strawn rather than Smith were made by Dr. Wickert. Dr. Kushner had left ISU two years prior. The district court made no finding questioning Dr. Wickert's credibility, and upon our review, we see no reason to question his credibility.

strengths in these areas, but contended he had *different* strengths, such as his writing ability. This is not enough to demonstrate that the reasons given for hiring Strawn were pretextual. It does not tend to show that Dr. Wickert chose Strawn over Smith because Smith had reported his suspicions of Reinig's financial misconduct to President Geoffroy's executive assistant three years earlier.

Smith's 2010 retaliation hypothesis rests on two pieces of evidence. First, Smith points out that Dieterle was involved in putting together the job description for the communications specialist in 2010. In that regard, Smith complains that one of the preferred qualifications for the job was an advanced degree in journalism, English, communications, or a related field. Strawn had such a degree; Smith did not. Yet there were three other areas in which Strawn graded out ahead of Smith. Smith does not challenge Dr. Wickert's reliance on those areas or contend they resulted from Dieterle's involvement in fashioning the job description.[23]

Second, Smith points to some notes of a January 26, 2010 meeting apparently attended by Dr. Wickert, Eichorn, Dieterle, and three others regarding ECM (Exhibit 130).[24] Although no one who was asked about it could recall the meeting, the notes suggest there was discussion about reorganizing ECM. The notes refer to five employees plus Dieterle potentially staying, to fill the roles of web designer, digital media specialist, two graphic designers, and a communications specialist who

---

[23]Smith and one of his trial witnesses also testified that the references to graphic design and Adobe Creative Suite in the job description were intended to disadvantage him. But the search committee rated both candidates as essentially equal (or equally limited) in this area.

[24]Dr. Kushner was not at the meeting referenced in Exhibit 130, having left ISU in 2008.

would work on Adobe products and content management. Strawn was one of those listed under "who stay." Three employees—including Smith—were listed as "would consider" an early retirement incentive program.

But it would be a significant leap to argue that these notes demonstrate the course of action followed by Dr. Wickert months later was retaliatory. The notes contain no reference to Reinig and appear to be nonjudgmental brainstorming about how to reorganize and downsize the ECM unit. Smith was not singled out. Smith does not dispute that he and the other two employees in fact were eligible for the early retirement incentive package, one common approach often used to bring about reductions in staff. Moreover, the plan later changed. For example, two of the "who stay" employees did not stay.

In sum, regardless of the standard applied, we cannot find that Smith's loss of his job in 2010 was causally linked to his discussion with President Geoffroy's executive assistant in 2007 regarding Reinig's billing practices. For this reason, we set aside the district court's award of damages under section 70A.28(2) relating to this event.

This leaves the $110,732.22 in damages awarded by the district court under section 70A.28(2) for harms to Smith's reputation. Smith argues that the State failed to preserve error on these damages, and we agree. As noted above, we believe the State waived its "no causation" challenge to the jury's finding of *liability* on the statutory whistleblower claim. However, in the *damages* phase of the case, the State clearly advanced the position that Smith's reporting to a public official did not result in Smith's loss of his job in 2010. Thus, it is appropriate for us to consider this aspect of the State's appeal, and Smith does not dispute that point.

However, the State never argued to the trial court the propriety of awarding reputational-harm damages per se. While the district court's decision to award these damages may have come as a surprise, the State could have readily filed a posttrial motion under Iowa Rule of Civil Procedure 1.904. It did not do so. Therefore, we decline to consider for the first time on appeal the State's arguments that reputational damages are not available under section 70A.28. *See* Iowa Code § 70A.28(5)(*a*) (stating that a person is liable "for affirmative relief including reinstatement, with or without backpay, or any other equitable relief the court deems appropriate, including attorney fees and costs").

## IV. Conclusion.

For the foregoing reasons, the decision of the court of appeals is affirmed in part and vacated in part, and the judgment of the district court is affirmed in part and reversed in part. Specifically, we uphold the jury verdicts of liability and the jury award of damages for intentional infliction of emotional distress. We affirm the district court's award of reputational-harm damages because the State, in our view, failed to preserve error with respect to the challenge to that award it is now pursuing on appeal. Finally, we reverse the district court's award of damages under section 70A.28 for Smith's loss of employment because we do not find any connection between that job loss and Smith's reporting to a public official. We remand this case to the district court for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART, VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

All justices concur except Appel, J., who concurs specially, and Wiggins and Hecht, JJ., who concur in part and dissent in part.

**APPEL, Justice (concurring specially).**

I concur in the court's decision that the district court's judgment in favor of Smith and its award of damages for intentional infliction of emotional distress damages should be upheld. I join fully in the court's opinion on these issues.

With respect to retaliatory discharge, I concur in result only. While I recognize our review is de novo, the district court heard the evidence in this case and necessarily made credibility determinations adverse to Iowa State University (ISU). I do not doubt that ISU was facing serious financial difficulties, that a reduction in employment in the College of Engineering was the only practical alternative in light of fiscal challenges, and that a nonretaliatory decision was made to focus on administrative rather than teaching staff. But Smith claims that the reorganization that resulted was essentially rigged to result in his discharge, noting, among other things, a memo of a meeting attended by the apparent decision-maker, Dean Wickert, prior to the implementation of the reorganization, identifying another employee as the sole communication specialist to survive change, the manipulation of the job description in a fashion unfavorable to him, the lack of request for writing samples by the committee reviewing finalists, and the unusual procedure of eliminating all positions and hiring anew, thereby improving the prospects for the favored part-time employee to move into the "new" position. An employer cannot avoid liability for tortuous discharge of an employee through a sham reorganization. *See Collazo v. Bristol-Myers Squibb Mfg.*, 617 F.3d 39, 52 (1st Cir. 2010) ("An employer may, of course, exercise its business judgment to eliminate positions as part of a company reorganization or reduction in force, even if the individuals in those positions have engaged

in protected activity or are members of protected groups. However, an employer may not use 'reorganization' or 'layoff' as a convenient excuse for terminating an employee on a discriminatory or retaliatory basis." (Citation omitted.); *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 69 (1st Cir. 2002) ("An employer may not try to shield a discriminatory or retaliatory termination by hiding it in a layoff.").

While Smith's position may have legal support, the question remains whether as a factual matter Smith is entitled to prevail on his retaliation theory. The factual issue on retaliation presented to us on de novo rule is, to use the court's term, "a close one." But even accepting the notion that the unusual character of the reorganization may have been structured in a fashion unfavorable to Smith's continued employment, I am not convinced that Smith has shown the necessary causal link between his report of misconduct to the president. Among other things, his discharge occurred three years later after the departure of Reinig and after the relationships within the unit had stabilized. As a result, I concur in the result on the retaliation claim.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I agree with the court's well-reasoned analysis regarding Smith's intentional infliction of emotional distress claim. I also mostly agree with the court's analysis of Smith's whistleblowing claim under Iowa Code section 70A.28(2) (2007), however, I part ways with the court's damage analysis regarding the whistleblowing claim.

I begin my analysis by examining the record and the law of the case under this record. The parties stipulated that the jury would decide liability on Smith's whistleblowing claim and the district court would decide the damage issue. The district court included the agreed-upon elements of the whistleblowing claim in the instructions submitted to the jury. The agreed upon elements that the court instructed on were:

1.  The Plaintiff reported to a public official, Iowa State University President Gregory Geoffroy that Pamela Reinig had committed a violation of a law or rule, mismanagement, a gross abuse of funds or an abuse of authority,

2.  That Plaintiff reasonably believed the matter he was reporting,

3.  That Iowa State University took action or retaliated against the Plaintiff after August 16, 2007, when the president received the Plaintiff's appeal of his first grievance[,]

4.  The Defendant's conduct was a proximate cause of the Plaintiff's damage,

5.  The amount of damage[.]

Based on these instructions, the jury answered the following question in the affirmative, "Did Iowa State University retaliate against Plaintiff as explained in Instruction No 11 because he reported certain matters to a public officer?" The jury based its answer on finding Iowa State's retaliation was the *proximate cause* of some damage suffered by

Smith. The district court then used this law, as used by the jury, to find the facts in favor of Smith on the retaliation claim and to determine Smith's damages.

The court in its majority opinion disregards the jury's and the district court's findings; finds the facts regarding damages anew; and slashes the judgment by $634,027.40, the amount of income the district court found Smith lost because of his termination from employment in August 2010. I would leave the verdict intact.

I reach my conclusion by starting with the legal proposition that when Iowa State stipulated to the jury deciding the liability issue and then failed to object to the instruction, the instruction became the law of the case, even if the instruction misstated the law. *Froman v. Perrin*, 213 N.W.2d 684, 689 (Iowa 1973); *see also Champlin v. Walker*, 249 N.W.2d 839, 840 (Iowa 1977); *Bus. Ventures, Inc. v. Iowa City*, 234 N.W.2d 376, 384 (Iowa 1975); Robert G. Allbee & Kasey W. Kincaid, *Error Preservation in Civil Litigation: A Primer for the Iowa Practitioner*, 35 Drake L. Rev. 1, 23 (1985–1986). Thus, the causation requirement for this cause of action was proximate cause.

Next, I agree with the fact finding of the district court and adopt its reasoning. Even though our review is de novo and we are not bound by the district court's findings, we do "give deference to those findings because the district court had the opportunity to assess the credibility of the witnesses." *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010).

The court's majority opinion considers the facts anew regarding causation by finding Dieterle's and Dr. Kushner's testimony credible. This finding by our court flies in the face of the district court's finding

regarding the credibility of Dieterle and Dr. Kushner. Specifically, the district court found:

> the testimony of Dieterle and Kushner was largely not credible. Kushner's lack of credibility was especially apparent in matters relating to his recollection of his actions against [S]mith. The Court was struck with his defense of Reinig despite her confessed theft of ISU funds.

> Dieterle's testimony was less profound, but it was obvious that his goal in the testimony was to protect himself. His testimony would occasionally intersect with the truth, but this was obviously more by coincidence than design.

It is difficult for me to credit Dieterle's and Dr. Kushner's testimony in light of the district court's finding.

Moreover, my review of the evidence supports the district court's finding. The district court found at one point in its ruling

> Dieterle made the determination that Smith's position would be eliminated. Testimony established that the ECM [Engineering, Communications and Marketing department] was the only unit to have all staff terminated and the only unit to have its own reorganization plan. Despite the fact that the unit was purportedly eliminated, the Director of the ECM, Dieterle, was not terminated. A new unit called Engineering College Relations ("ECR") was created. Dieterle determined that "new" job descriptions were required to create "new" positions rather than retaining any existing staff besides himself. Smith testified that this was done in order to terminate him and get around existing ISU policies that would prevent doing so and retaining a part-time writer, Jessie Strawn, full-time. Witnesses for Smith corroborated his testimony by testifying that it did not make business sense to eliminate entirely the only cost-recovery unit in the College of Engineering based on budgetary concerns. Smith testified that ISU counsel, Paul Tanaka, had been attempting to get Smith to leave his position in the ECM in 2008. That supports the fact that ISU was engaged in continuous attempts to get rid of Smith. The testimony of Dean Wickert that the elimination of ECM was his decision was brought into question by evidence suggesting that dissolution had been discussed by Dieterle prior to Wickert becoming Dean, in approximately September of 2008 in response to an "organizational dilemma." (Trial Exhibit 114[.]) It is an appropriate inference that Smith was the "organizational dilemma." Documentary evidence also suggests that

contrary to ISU's testimony, the determination was made as early as January of 2009 that Smith would be terminated. (Trial Exhibit 130[.])

ISU also failed to rehire Smith despite the fact that he was qualified and a senior full-time employee. Dieterle testified that he had determined the job descriptions for the purportedly new positions. Smith testified that Dieterle had tailored them to favor a part-time writer, Jessi[e] Strawn. Smith also testified that work had been removed from him prior to the termination and assigned to Strawn in anticipation of his termination. ISU's witnesses testified that a committee was formed to review applications for the position of communication specialist, purportedly to prevent any bias and lend legitimacy to the hiring. However, according to defense witness John Glover, the committee in fact met with Dieterle prior to this process. Ultimately the committee did not make a recommendation or determine whom to hire; rather, the decision was made by Dean Wickert, who acknowledged that he had been briefed on Smith's lawsuit against ISU upon taking his position as Dean.

Exhibit 130 is especially telling. In this handwritten note, Dieterle and Dr. Kushner have Smith retired from the University and his replacement in the new position. Exhibit 130 was authored after Smith complained to President Geoffroy, but before the reorganization of the department took place.

Accordingly, I would accept the findings of the district court and affirm in its entirety.

Hecht, J., joins this concurrence in part and dissent in part.